THE STATE OF OHIO, APPELLEE, *v.* SCHMIDT, APPELLANT.

[Cite as State v. Schmidt (1979), 65 Ohio App. 2d 239.]

(No. L-78-237—Decided July 20, 1979.)

*Mr. Anthony G. Pizza,* prosecuting attorney, and *Ms. Eloise M. Gries,* for appellee.

*Messrs. Secor, Ide & Callahan* and *Mr. John J. Callahan,* for appellant.

BROWN, J.   Defendant-appellant, William J. Schmidt, was tried by a jury on a murder indictment in the Court of Common Pleas of Lucas County. During the presentation of defendant's evidence, the state moved for a mistrial on the ground that the trial court had improperly admitted evidence of the violent character of the victim, Robert Slough. Over defendant's objection, the trial court declared a mistrial and discharged the jury.

When the case was rescheduled for a new trial, defendant moved to dismiss the indictment, contending that he was being placed in double jeopardy for the same offense. Defendant's motion to dismiss was overruled.

Defendant now appeals from the order declaring a mistrial and from the final judgment overruling defendant's motion to dismiss the indictment.

At the trial, defendant claimed self-defense. Defendant was superintendent and general foreman of a construction company in charge of installation of a sewer main. Slough was his subordinate, employed as a pipe layer. A few weeks before Slough's death, defendant had discharged Slough for insubordination.

On the evening of Slough's death, defendant left a restaurant after dinner. Defendant had a weapon concealed on his person. Slough followed defendant out of the building. Neither had spoken to the other inside the restaurant. The confrontation by the two men outside the restaurant was unnoticed by anyone else until defendant fired the fatal shot at Slough.

In support of his claim of self-defense, defendant, in cross-examining the state's witnesses, elicited testimony that Slough's character and reputation was that of a violent person. Two deputy sheriffs testified that Slough had a reputation for violence and that he was known to law enforcement authorities as a violent person. Slough's widow admitted that his violent treatment of her on several occasions resulted in calls to the sheriff's department for assistance.

In presenting his defense, defendant offered testimony of two other deputy sheriffs who were physically abused by Slough when they answered a distress call from his wife. Defendant also introduced copies of police reports of Slough's violence toward his wife, her children and her mother.

Following this testimony, the state moved for a mistrial on the ground that at the time of the shooting defendant did not know of the specific instances of violent behavior on the part of Slough. Defendant was thereupon interrogated, in camera, by counsel and the trial judge. Defendant admitted that while he knew of Slough's reputation for violence he had no knowledge of specific incidents.

Defendant requested that the court reserve ruling on the motion for a mistrial until all the evidence was presented to the jury. The trial court denied defendant's motion, but, granted the state's motion for a mistrial over defendant's objection.

Defendant contends that the evidence of Slough's acts of prior violence was admissible; that as a consequence, the order of mistrial was contrary to law; and that for this reason, the indictment should be dismissed to avoid violation of defendant's constitutional rights under the Double Jeopardy Clause.

The defense advances two reasons for the admissibility of Slough's prior violent acts: (1) by placing the character of the victim, Slough, in issue in the case in chief, the state opened the door for defendant to present evidence of specific instances of the deceased's violent conduct; and, (2) even if the state had not placed the victim's character in issue, such evidence was nevertheless admissible either on the question of who the aggressor was or as tending to impeach the testimony of Slough's widow that her husband was not of a violent nature.

Additionally, defendant contends that the trial court should not have declared a mistrial until all other alternatives to cure the alleged error had been fully considered and discarded.

In support of the first reason, involving the state's placing the character of the deceased in issue in its case in chief, defendant directs our attention to the following testimony of Slough's widow produced by the state on direct examination:

"Q. Now what kind of a provider was your husband? Did he support his family?

"A. Yes.

"Q. Did you have a good family life?

"A. Yes.

"Q. Reasonable family life?

"* * *

"Q. What kind of surgery are you talking about?

"A. *** So, physically, he knew that, you know, he couldn't stand to fight, really or any physical violence. So, I don't really know, you know, what sparked him into following Mr. Schmidt outside, because at that point—."

The purpose of such testimony could only be to show that the decedent, Slough, was a quiet, peaceable man who provided for his family and was not inclined to fighting or physical violence.

It is an elementary rule that the state, in its case in chief, may not introduce testimony in a murder case evidencing the character and reputation of the deceased victim as a quiet and peaceable person. *Carr* v. *State* (1900), 21 C.C. 43, affirmed (1902), 65 Ohio St. 612; 40 American Jurisprudence 2d 577, Homicide, Section 308. However, for tactical reasons or otherwise, defense counsel did not object to this incompetent

evidence introduced by the state. It was, therefore, properly admitted in evidence.

Another elementary rule, applicable to such evidence introduced by the state, is as follows. If incompetent evidence is admitted on behalf of one party, evidence contra, offered by the adversary, is admissible to rebut or explain the tainted evidence. 21 Ohio Jurisprudence 2d 213, Evidence, Section 202. The state, by introducing evidence that Slough was a peaceable man and a good family man, was placing Slough's character in issue; and, by such action, the state gave defendant the right to offer countervailing evidence to prove that the decedent, Slough, was neither a good family man nor a quiet and peaceable person.

In support of the second reason, involving the right of defendant to offer evidence to establish who the aggressor was and to impeach the testimony of Slough's widow that her husband did not have a tendency toward violence, defendant directs our attention to the following well-settled principle of law. When evidence of the deceased's violent character is offered "***to show the defendant's state of mind, it is obvious that the deceased's character, as affecting the defendant's apprehensions, must have become known to him; *i.e.,* proof of the character must indispensably be accompanied by proof of its *communication to the defendant;* else it is irrelevant.***" (Emphasis *sic.*) 1 Wigmore on Evidence (3 Ed. 1940) 467, 470, Section 63. But, when evidence of the deceased's character is offered to show that he was the aggressor, "***this additional element of communication is unnecessary; for the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do. The inquiry is one of objective occurrence, not of subjective belief.***" 1 Wigmore on Evidence, *supra,* at pages 470 to 471. Where competent evidence of character is offered for the purpose of showing that the deceased victim was the aggressor, such evidence is admissible, regardless of the extent of the accused's knowledge of such character or of the particular evidence in question. See 1 Wharton's Criminal Evidence (13 Ed. 1972) 510, Section 236, and cases cited therein.

Evidence of decedent's character to establish that he was the aggressor includes specific acts of violence previously committed and prior convictions. The state, in arguing that the

defense cannot introduce specific prior acts of violence by the deceased to establish who the aggressor was, relies on *State* v. *Roderick* (1907), 77 Ohio St. 301; *Upthegrove* v. *State* (1882), 37 Ohio St. 662; and *Marts* v. *State* (1875), 26 Ohio St. 162. These cases are distinguishable. In *Roderick, supra,* the evidence of specific acts of violence was not offered to establish who the aggressor was, but, as stated in paragraph two of the syllabus, was offered "***for the purpose of showing reasonable ground for apprehension of bodily injury or loss of*** life***." Likewise, in the *Upthegrove* and *Marts* cases, *supra,* the Ohio Supreme Court did not consider the issue of who the aggressor was and was not concerned with an offer of evidence of specific acts of violence by the deceased.

Furthermore, proof of the prior specific acts of violence of the deceased, unknown to defendant, was competent to impeach the evidence introduced by the state in the case *sub judice.* Slough's widow had testified to Slough's peaceful nature. Her cross-examination by the defense, revealing specific acts of violence by Slough toward her and others, was admissible impeaching evidence. The testimony of two deputy sheriffs who testified for the defense to corroborate Slough's prior acts of violence was, likewise, proper evidence to impeach Mrs. Slough. 56 Ohio Jurisprudence 2d 784, Witnesses, Section 347.

As a result of our view that the challenged evidence concerning Slough's specific acts of violence was relevant and admissible, it was error and an act contrary to law for the trial court to declare a mistrial.[2] An order of the trial judge declaring a mistrial during the course of a criminal trial, on motion of the state, is error and contrary to law, constituting a failure to exercise sound discretion, where, taking all the circumstances under consideration, there is no manifest necessity for the mistrial, no extraordinary and striking circumstances and no end of public justice served by a mistrial, and where the judge has not made a scrupulous search for

[2] The rule on appeal—that if the ground for exclusion of evidence is not obvious to the trial judge and opposing counsel without stating it, such want of specificity is a waiver of the objection for appeal purposes, McCormick on Evidence (2 Ed. 1972) 113, 115 to 117, Section 52—is confined solely to appeal of rulings on admission or exclusion of evidence, and does not apply to an erroneous final judgment granting a mistrial on the state's motion. 15A Ohio Jurisprudence 2d 438, Criminal Practice and Procedure, Section 371; cf. 53 Ohio Jurisprudence 2d 218, Trial, Section 296.

alternatives to deal with the problem. *United States* v. *Jorn* (1971), 400 U. S. 470; *Downum* v. *United States* (1963), 372 U. S. 734; *United States* v. *Perez* (1824), 22 U. S. 579 (9 Wheat. 579).

The next inquiry which follows from the erroneous declaration of a mistrial concerns the trial judge's refusal to grant defendant's motion to dismiss the indictment. The trial court erred in refusing to dismiss the indictment under the factual and legal posture existing in the case when the mistrial was ordered.

Where, as in the case *sub judice*, the trial judge grants a mistrial over objection of defendant in the mistaken belief that evidence of specific acts of prior violence of the decedent (the victim) in a murder trial have been erroneously introduced in evidence, such order of mistrial is an abuse of discretion. Defendant's prosecution in a second trial, where the first trial was improperly terminated on the state's motion before a verdict was rendered, would violate the Double Jeopardy Clause (Fifth Amendment to the United States Constitution and Section 10, Article I, Ohio Constitution). As a result, the indictment must be dismissed on the motion of defendant. *United States* v. *Jorn, supra* (400 U. S. 470), headnote 3, at page 471; *Downum* v. *United States, supra.*

The judgment of the Court of Common Pleas of Lucas County, denying defendant's motion to dismiss, is reversed. Coming now to enter the judgment which the Court of Common Pleas should have entered, it is ordered that the indictment of the defendant be and the same hereby is dismissed and the defendant ordered discharged.

*Judgment reversed.*

POTTER, P. J., and CONNORS, J., concur in the judgment.

POTTER, P. J., concurring.   Judge Connors and I concur with the judgment, but our concurrence is based on a somewhat different view of the facts and the law than expressed by Judge Brown. Defendant argues in this court that the contested evidence, which was the cause of the mistrial, was admissible for the reasons that he had a right to impeach the testimony of Mrs. Slough concerning her husband's peaceable character and that he had a right to show who was the actual

aggressor on the night that Mr. Slough died. However, I do not find that these theories were argued to the trial court to resist the state's motion for a mistrial. The state rested its motion on the contention that the defendant had no knowledge of the victim's reputation for violence or of other particular acts by the victim. The state cited this court's opinion in *State* v. *Brown* (Lucas Co. Ct. of Appeals No. 7679, October 25, 1974), unreported. In effect, the defendant is now arguing that if there was any reason, although not presented to the trial court for the admission of the evidence, it was error to deny the admission. I do not find this to be the law relative to the determination of objections as to the admission of evidence on appeal. See McCormick on Evidence (2 Ed. 1972) 113, at page 117, Section 52.

I would, nevertheless, concur that a mistrial was wrongfully granted and that the defendant, having been placed once in jeopardy, cannot now be retried. I do this reluctantly because of the serious nature of the charge and the interest of society.

In *United States* v. *Perez* (1824), 22 U. S. 579, at page 580 (9 Wheat. 579, 580), Mr. Justice Story held as follows:

"***We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extermely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.***"

The American Criminal Law Review contains an excellent article on this subject, see Note, Double Jeopardy Consequences of Mistrial, Dismissal and Reversal of Conviction on

Appeal, 16 Am. Crim. L. Rev. 235. The author, beginning at page 249, outlines the judicial history of mistrials since the rendition of *Perez, supra.* Also, at page 249, the author indicates that *Downum* v. *United States* (1963), 372 U. S. 734, and *United States* v. *Jorn* (1971), 400 U. S. 470, which are cited in Judge Brown's majority opinion, appear as "***a departure from this extremely deferential standard of review." However, *Illinois* v. *Somerville* (1973), 410 U. S. 458, and *Arizona* v. *Washington* (1978), 434 U. S. 497, mark a return to what the author views as the casual treatment of the defendant's "valued right." See Note, *supra,* 16 Am. Crim. L. Rev. 235, at pages 250 to 253. Nevertheless, *Somerville, supra,* and *Washington, supra,* can be distinguished. *Somerville* involved a defect in an indictment; no evidence had been introduced. *Washington* was concerned with an improper remark by defense counsel during opening statement. "***The questions presented are whether the record reflects the kind of 'necessity' for the mistrial ruling that will avoid a valid plea of double jeopardy, and if so, whether the plea must nevertheless be allowed because the Arizona trial judge did not fully explain the reasons for his mistrial ruling." *Washington, supra,* at page 498.

Although not the common law rule, the United States rule is that jeopardy attaches in a jury trial after the jury is sworn. See *Crist* v. *Bretz* (1978), 437 U. S. 28; 15 Ohio Jurisprudence 2d Rev. 775, Criminal Law, Section 353, and cases therein cited. As to the history of the rule, see Note, *supra,* 16 Am. Crim. L. Rev. 235, at pages 241 *et seq.* The " '***valued right [is] to have***[a] trial completed by a particular tribunal.' " *United States* v. *Jorn, supra,* at page 484. In *Washington, supra,* at pages 505 to 508, the court said the following:

"***Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant.

"The words 'manifest necessity' appropriately characterize the magnitude of the prosecutor's burden. For that reason Mr. Justice Story's classic formulation of the test has been quoted over and over again to provide guidance in the

decision of a wide variety of cases. Nevertheless, those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate.

"The question whether that 'high degree' has been reached is answered more easily in some kinds of cases than in others. At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this 'abhorrent' practice. As this Court noted in *United States* v. *Dinitz,* 424 U. S. 600, 611:

" 'The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by judge or prosecutor"…threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant.'

"Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused."

The *Washington* case turned, in part, upon the trial court's assessment of possible juror bias created by the conceded improper comment of defense counsel. The case *sub judice* concerns a ruling on evidence, and, to this writer, does not rise to the level of possible juror bias or the requirement to give deference to the trial court's opinion of possible bias. Furthermore, in the case *sub judice* there appears to have been no attention given to other alternatives. See Mr. Justice

Marshall's comments and dissent in *Washington, supra,* at pages 521 to 522, as follows:

"Although from this distance and in the absence of express findings it is impossible to determine the precise extent to which defense counsel's remarks may have prejudiced the jury against the State, the circumstances set forth above suggest that any such prejudice may have been minimal and subject to cure through less drastic alternatives. For example, the jury could have been instructed to disregard any mention of prior legal rulings as irrelevant to the issues at hand, and to consider as evidence only the testimony and exhibits admitted through witnesses on the stand. Were there doubt whether such instructions alone would suffice to cure the taint, the jury could have been questioned about the extent of any prejudice. Given the anticipated length of the trial (almost two weeks), it is not unlikely that, had the jury been appropriately instructed when the court first found defense counsel to have erred in his opening statement, any prejudice would have dissipated before deliberations were to begin. For these reasons, it is impossible to conclude that a finding of necessity was implicit in the mere grant of the mistrial."

In the *Washington* case the fact situation was much more favorable to the prosecution than the present fact situation. The cases above refer to rather obvious improper acts of the defense or acts of prosecutorial manipulation or erratic conduct by the court necessitating a mistrial. In the instant case, the mistrial was a belated effort by the trial court to correct what it believed to be errors in the admission of evidence. While there is precedent in Ohio for sustaining the declaration of a mistrial on this ground (improperly admitted evidence), see *State* v. *Wiley* (Ohio App. 1975), 324 N.E. 2d 287, at least in that case, a mistrial was declared because of solicitude for the accused. See, also, Schulhofer, Jeopardy and Mistrials, 125 U. Pa. L. Rev. 449, at page 481, as follows:

"Even in the absence of misconduct by counsel, improper evidence may be, and of course often is, aired before the jury. If the testimony is relatively insignificant, the jury simply may be instructed to disregard it, but if the evidence is highly prejudicial, counsel often will seek a mistrial to ensure that a truly unbiased finder of fact will decide the case. When mistrial orders of this kind are entered at the request of the prosecu-

tion, most courts considering double jeopardy claims scrutinize closely the need for mistrial.***"

While not clearly articulated in the instant case, the alleged admission of improper evidence apparently was the grounds of "manifest necessity." There was no statement in the record of exploration of alternative solutions.

In the case *sub judice*, there was no misconduct by either the prosecution or defense. At best, there was a difference of opinion as to the rules of evidence, but this did not necessitate a mistrial. In the case under consideration, unlike the *Somerville* and *Washington* cases, *supra*, the state had rested; and, it can be concluded from the record that the defense had practically completed its case. See Schulhofer, *supra*, at pages 510 to 511, concerning stringent limitations upon declaring a mistrial after the state has rested.

Although I am of the opinion that the reason that the trial court declared a mistrial in the case *sub judice* was based upon the principle that the defendant had no knowledge of the victim's reputation for violence, or of specific violent acts of the victim, nevertheless, I find that the defendant should not now be put to the expense, anxiety and embarrassment of a second trial, with restrictions on his liberty, and that the defendant should not have to forego his " '***valued right to have his trial completed by a particular tribunal.' " *United States* v. *Jorn, supra,* at page 484. Mr. Justice Douglas in *Gori* v. *United States* (1961), 367 U. S. 364, at page 372, in his dissent, referred to Mr. Justice Story's oft-repeated statement in *United States* v. *Coolidge* (1815), 25 Fed. Cas. 622, 623, that the trial court's "***discretion is to be exercised 'only in very extraordinary and striking circumstances.' " Then, Mr. Justice Douglas, in *Gori, supra,* at page 373, made this closing observation which also seems fitting as a closing for this concurrence:

"***The policy of the Bill of Rights is to make rare indeed the occasions when the citizen can for the same offense be required to run the gantlet twice. The risk of judicial arbitrariness rests where, in my view, the Constitution puts it—on the Government."