OPINION
{¶ 1} Appellant, Horace K. Vinson Jr. ("Vinson Jr."), appeals from the Lake County Court of Common Pleas' judgment entry of October 24, 2006, in which he was sentenced to a prison term of fifteen years to life for felonious murder with a firearm and eighteen months for carrying a concealed weapon. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History *Page 2 
 {¶ 3} On May 15, 2006 appellant was indicted by the grand jury for the counts of murder, in violation of R.C. 2903.02(A), felonious murder, in violation of R.C. 2903.11 and 2903.02(B); voluntary manslaughter in violation of R.C. 2903.03(A), and carrying a concealed weapon, in violation of 2923.12(A)(2). A firearm specification, in violation of R.C. 2941.145, was added to the counts of murder, felonious murder, and voluntary manslaughter.
 {¶ 4} The charges raised in the indictment stem from the death of Mr. Michael Rush ("Rush"), which occurred on January 28, 2006 after an altercation with appellant resulted in gunfire. Appellant was placed on house arrest with electronic monitoring until the time of trial. His motion to be released from the electronic monitoring was denied on June 15, 2006. On August 8, 2006 the state filed for a motion for grand jury testimony as the state believed the police statements of the witnesses conflicted with their grand jury testimony. The court denied this motion on August 11, 2006. However, on August 16, 2006, the court granted the state's motion to reconsider the grand jury testimony since the two witnesses, Ms. Jennifer Gedeon ("Gedeon"), appellant's fiancée and mother of his minor child, and Mr. Horace Vinson Sr. ("Vinson Sr."), appellant's father, were adverse parties. Appellant also named them on his witness list that was filed the next day, August 17, 2006. On August 16, the court also granted the state's motion to compel discovery.
 {¶ 5} The state filed a motion in limine to exclude certain evidence regarding the character of the victim or any specific instances of the victim's conduct on August 21, 2006. On the same day, the court granted the motion in limine before proceeding with *Page 3 
the jury trial, which prevented appellant from introducing Rush's criminal record to the jury.
 {¶ 6} The case proceeded to jury trial on August 21, 22, and 23 of 2006. The state presented evidence and testimony of fifteen witnesses. The witnesses consisted of two dispatchers from the Willowick Police, Ms. Karen Norris and Ms. Lisa Hudson; various officers and detectives from the Willowick Police Department, which included Patrolman David Neibecker ("Patrolman Neibecker"), Patrolman Todd Daubemire, Detective John Malady, Detective Robert J. Prochazka, and Officer Jeff Pyle ("Officer Pyle"); as well as forensic fingerprint and firearm examiner, Mr. Mitchell J. Wisniewski; forensic scientist, Mr. Marin Lewis; DNA technical manager, Mr. Stephen LaBonne; senior forensic chemist/toxicologist, Mr. Douglas Rhode; and Lake County pathologist, Dr. William Bligh-Glover; in addition to eyewitness bystander, Mr. Leonard Walters, the property manager of Queensdale Apartments, Ms. Leah Coolidge; and a friend of Rush, Ms. Sheila Moton ("Moton"). The state also presented appellant's taped video interview with the police, which was recorded on the day of the incident.
 {¶ 7} The evidence established that on January 28, 2006, at around 3:00 p.m. in the afternoon, Rush arrived at Vinson Sr.'s house to pick up Gedeon and her belongings because Gedeon decided to leave appellant and move in with Rush. About three months prior to the murder, while all three were residing in Mentor at the Queensdale Apartments (where Rush, Gedeon, and Vinson Jr. first became acquainted), Rush and Gedeon became intimately involved. Subsequently, Gedeon and appellant were evicted for failure to pay rent, and they went to live with appellant's father, Vinson Sr., who lived on 435 Fairway Drive in Willowick. At this time, appellant *Page 4 
was aware of the relationship between Gedeon and Rush. Subsequently, Gedeon informed appellant that she wanted to terminate her relationship with Rush, but that she was afraid to do so. Appellant alleged that Gedeon relayed to him that Rush was making threats against him and that Rush carried a gun.
 {¶ 8} Two days prior to the shooting Gedeon arrived at Vinson Sr.'s house in Rush's jeep. She told appellant that she wanted to leave Rush but that she was scared he would come and find them. Appellant borrowed money from Vinson Sr. and appellant, Gedeon, and their son, fled to a motel for two nights. On their way they abandoned Rush's jeep, with the key in the ignition at a nearby Giant Eagle parking lot. Initially, they planned on staying at the hotel only for Thursday night, but on Friday morning before appellant left for his job with the Chestnut Hill Water Company, they decided to stay that night as well. Appellant returned to the motel when his shift was over, only leaving briefly to purchase chinese food for their dinner.
 {¶ 9} The following day, Saturday, January 28, 2006, they returned to Vinson Sr.'s around 11:00 a.m. Appellant had an alcoholic beverage and Gedeon decided that she would go tanning. She left in appellant's truck and was seen entering Rush's apartment by the property manager, Ms. Leah Coolidge ("Coolidge") at approximately 2:00 p.m. When Gedeon returned to Vinson Sr.'s house, she told appellant she was leaving him for Rush, and that someone would be picking her up in fifteen minutes.
 {¶ 10} A short while later, Rush backed his jeep into Vinson Sr.'s driveway and he and Gedeon began loading his jeep with her belongings. Appellant looked out the window, saw Rush and went to the hall closet where he retrieved Vinson Sr.'s gun and loaded it with bullets. Appellant then went to the front door and yelled at Rush "Hey *Page 5 
nigger, get off of my lawn." Rush and appellant made fighting gestures and there is conflicting testimony as to whether they physically pushed each other or were just threatening to push each other. Appellant then picked up a rock and threw it at Rush's jeep.
 {¶ 11} The altercation escalated and at this point, the eyewitness' testimony of bystander, Leonard Walters ("Walters"), who was standing across the street, diverges from the testimony of appellant. Appellant alleged that Rush, in attempting to pull his gun out of his waistband, dropped his weapon on the ground. Rush then went into a crouch to pick up the gun and at this point, their eyes met and appellant became afraid for his life. Appellant pulled out his gun, which was concealed underneath his sweatshirt, flipped around as Rush was pointing his gun at him, and began shooting.
 {¶ 12} Walters testified that Rush never crouched down and did not have his arms raised shooting as he was running away from appellant. Rather, his arms were down by his side. He also never observed Rush with a gun or appellant fleeing in the opposite direction of Rush.
 {¶ 13} Four shots in rapid succession were fired. Rush fell down about three houses down at 419 Fairway. Walters observed appellant standing on the front lawn of Vinson Sr.'s with a smoking gun. Appellant then threw his gun down on the ground and flung himself face-down on the front lawn to await the arrival of the police.
 {¶ 14} Vinson Sr. rushed out of the house and asked appellant "What the hell happened?" Appellant replied that Rush had a gun and was going to shoot him. Vinson Sr. ran over to Rush to check if Rush was still alive, which he was, and begged him to "please not die." He then called 911. The Willowick police arrived at the scene shortly *Page 6 
thereafter, responding to both Vinson Sr.'s call and Walters' call, who called 911 at roughly the same time.
 {¶ 15} Upon their arrival, the officers found Rush lying on the ground with a small pistol in his hand by 419 Fairway and appellant lying face-down on the grass of 435 Fairway. Patrolman Neibecker accompanied Rush to the hospital, where he was pronounced dead soon after arrival. At that time a gunshot residue test ("GSR") was performed on Rush. No gunshot residue was detected on either hand.
 {¶ 16} Rush's firearm, a .22 caliber Magnum, was fully loaded with five .22 caliber hollow point rounds. The gun was never fired and was retrieved from Rush's hand. Appellant's gun, a .22 caliber Interarms Rossi long revolver was retrieved from the front lawn and was loaded with five bullets, four of which had been fired. A GRS was performed on appellant's left hand and because gunshot residue was detected, following standard procedure, the right hand was not tested.
 {¶ 17} Officer Pyle, who was training Officer Neibacker at the time, secured the scene along with Officer Daubenmire and Officer Crowley. Officer Neibacker handcuffed appellant upon their arrival and placed him in the back of the patrol car while the officers further secured the scene. Appellant was later taken to the Willowick police station where he was interviewed and subsequently arrested. Vinson Sr. and Gedeon were also taken to the station, interviewed, and then released.
 {¶ 18} Dr. William Bligh-Glover, the Lake County forensic pathologist performed the autopsy on Rush. Rush was hit with two bullets, one which entered the back of his left ear and exited near his left eyebrow, and the other, which caused his death, entered in the middle of Rush's back above his third rib, and rested on his sternum. *Page 7 
 {¶ 19} The state also presented evidence and photographs taken from the scene. A bullet hole was found in the garage of 419 Fairway and blood splatter was located at 427 Fairway, on the garage at 419 Fairway, and a pool of blood was found on the front yard of 419 Fairway. DNA analysis was performed on all the blood found at the scene, all of which was identified as belonging to Rush.
 {¶ 20} After the state rested its case-in-chief, appellant testified on his own behalf. The jury returned a verdict of guilty on count two, felonious murder, in violation of R.C. 2903.02(B), with a firearm specification as set forth in R.C. 2941.145, and guilty of carrying a concealed weapon, a felony of the fourth degree in violation of R.C.2923.12(A)(2). Sentencing was deferred to October 10, 2006, and the matter was referred to the adult probation department for a pre-sentence investigation, DNA sample, and victim impact statements.
 {¶ 21} Appellant was sentenced on October 10, 2006 and October 20, 2006. On October 10, 2006, appellant's motion for new trial was denied. The court issued a judgment entry on October 24, 2006, which sentenced appellant to mandatory imprisonment of fifteen years to life for the count of felonious murder, with a mandatory three year term for the firearm specification, and eighteen months for the count of carrying a concealed weapon, all of which were ordered to be served consecutively to one another, for a total term of imprisonment of nineteen and one-half years.
 {¶ 22} Appellant timely appealed and now raises the following four assignments of error: *Page 8 
 {¶ 23} "[1.] The record of the trial below clearly establishes that trial counsel failed to provide effective assistance of counsel when he failed to call eyewitnesses, Jennifer Gedeon, and Horace Vinson, Sr. to testify on behalf of the defendant.
 {¶ 24} "[2.] The trial court erred and denied the Defendant-appellant his right to due process of law when the Defendant was prohibited from introducing evidence about his knowledge of the victim which led him to be fearful for his life.
 {¶ 25} "[3.] The trial court erred and denied the defendant Horace Vinson, Jr. his right to due process of law when his motion for new trial was overruled.
 {¶ 26} "[4.] The trial court erred and denied Horace Vinson, Jr. His [sic] right to due process of law when the state was permitted to introduce evidence that Michael Rush was a "nice guy"; that Horace Vinson, Jr. was a problem tenant who fought with Jennifer Gedeon constantly; had failed to pay rent and had been evicted and had accused the female property manager of "whoring around" with his girlfriend, Jennifer Gedeon."
 {¶ 27} Ineffective Assistance of Counsel
 {¶ 28} In his first assignment of error appellant contends that he was denied effective assistance of counsel because his counsel did not call to the stand witnesses Gedeon and Vinson Sr. Specifically, appellant argues that his Sixth Amendment right to counsel was violated because if these witnesses had been called they would have validated appellant's testimony. For the following reasons, we disagree.
 {¶ 29} "`[W]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. * * * The [Supreme Court of Ohio] recognized *Page 9 
that there are '(* * *) countless ways to provide effective assistance in any given case. State v. Allen (Sept. 22, 2000), 11th Dist. No. 99-A-0050, 2000 Ohio App. LEXIS 4356, 10, citing State v. Bradley
(1989), 42 Ohio St.3d 136, 142, quoting Strickland v. Washington (1984),466 U.S. 668, 687-689. Therefore, the court stated `judicial scrutiny of counsel's performance must be highly deferential. (* * *)'" Id.
 {¶ 30} "In addition, `because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (* * *).' Id. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." Id. (Parallel citations omitted.) Thus, "[t]o warrant reversal, `the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' * * *" Id. at 10-11, citing Bradley at 142, quoting Strickland at 694.
 {¶ 31} Further, "[t]his court concluded in State v. Rudge (Dec. 20, 1996), 11th Dist. No. 95-P-0055, 1996 Ohio App. LEXIS 5807, 12, that `[strategic and tactical decisions will not form the basis of a claim of ineffective assistance of counsel, even if there had been a better strategy available to him.'" Thus, "[e]rrors of judgment regarding tactical matters do not substantiate a claim of ineffective assistance of counsel." Allen at 11. (Citations omitted.)
 {¶ 32} Appellant claims that Gedeon and Vinson Sr. would have corroborated his testimony, and that they were in a superior position to "see and hear everything *Page 10 
surrounding the confrontation." We disagree with appellant's contention since these witnesses contradicted appellant's testimony in their interviews with the police. Further, we note that their testimony was an issue between the parties as the case proceeded to trial. The state made a motion to transcribe Gedeon's and Vinson Sr.'s grand jury testimony because the state was concerned that inconsistencies existed with their police interviews. Upon reconsideration, the court granted the motion.
 {¶ 33} A review of the record reveals that counsel had good cause for not calling these witnesses to the stand. Appellant testified that Gedeon never informed him who would be picking her up on the day of the shooting. However, Gedeon relayed to the police that she had warned appellant specifically of Rush's imminent arrival and asked him to "just stay in the house."
 {¶ 34} Also, according to appellant, Rush dropped his gun and crouched down to retrieve it. It was at that moment that their eyes met and appellant became fearful for his life, pulled out his gun, and started shooting. Gedeon, however, informed the police that "he [Rush] didn't drop the gun, he pulled it out. He pulled it out and pointed it at him. I saw it with my own eyes." Further, when the actual shooting occurred, Gedeon did not know who the shooter was or even observe the actual incident because she was running into the house.
 {¶ 35} Vinson Sr. was not present when the shooting occurred. Not only did he inform the police that he did not observe the actual shooting, but Gedeon and Walters both testified or gave statements that Vinson Sr. was not present. Indeed, Vinson Sr. only exited the house once the shooting was over. At that time, appellant was already lying face-down on the grass, and Rush was laying face up several houses down the *Page 11 
street. Thus, Vinson Sr. could not have been in a superior position to testify as to the events that occurred.
 {¶ 36} In any case, if appellant's counsel had called Vinson Sr. to the stand, his direct examination would have opened the door to testimony that would call into question Vinson Sr.'s motive and bias as to appellant. Specifically, the state wanted to introduce testimony by Officer Pyle as to a statement that was made to him by Ms. Violet Lawrence ("Lawrence") concerning Vinson Sr.'s state of mind. Lawrence worked with Vinson Sr.'s wife at a Sunoco gas station in Fairport Harbor and overheard a conversation between Vinson Sr. and his wife, Darlene ("Darlene".)
 {¶ 37} While on direct examination of Officer Pyle, both counsel approached the bench, and the prosecutor explained to the court: "This woman makes a statement to the officer that this Darlene [Vinson Sr.'s wife] was talking with dad, with Horace, Sr. and that dad says oh, we're talking about Michael Rush and Jennifer that oh, we've got a way to get rid of him."
 {¶ 38} The state argued this statement was probative since: "Dad had a charge back in the nineties and he got off on a self-defense on a felonious assault or some type of assault, I think it was a felonious assault and that this wasn't a chance that this guy came over, you know, he was called 15 minutes prior to that and he shows up at the place and then he's dead, you know, these guys basically set him up."
 {¶ 39} The court properly overruled this testimony since Vinson Sr. had not yet testified and his state of mind was not in issue, nor was his motive or bias as a witness yet called into question. *Page 12 
 {¶ 40} By testifying for the defense, Vinson Sr. would also have opened the door to cross-examination from the state about appellant's state of mind prior to the week of the shooting. The police continually questioned appellant if this was a crime of passion, to which appellant responded strongly in the negative. Rather, appellant testified that on the day of the incident his only concern was that Gedeon would take the baby when she left with Rush. Vinson Sr., however, relayed to the police that appellant had been distressed over the situation with Gedeon and Rush for the past month. The following colloquy occurred during Vinson Sr.'s interview with the police:
 {¶ 41} "Officer: Bo [appellant], he was upset because she was leaving him; right?
 {¶ 42} "Vinson Sr.: He would just be at the table eating and start crying and shit; you know what I'm saying? He was going to kill himself. This is all prior to this."
 {¶ 43} We fail to see how introducing these two witnesses would have strengthened appellant's case when in fact their testimony had the potential to be adverse to appellant's version of the events. As we succinctly stated in State v. Rudge: "In this case, appellant's trial co-counsel were aware of the existence of the witnesses, as to the content of their testimony, and based on that knowledge they made a conscious decision not to put the witnesses on the stand. This action suggests that the witnesses were not called to testify because appellant's attorney desired to preserve or enhance appellant's case in some manner, and not adversely affect his case." Id. at 39-40. Furthermore, "[t]he decision of whether to call witnesses is within the province of counsel's trial tactics." Allen at 12. See, also, State v.Santilli (April 25, 1997), 11th Dist. No. 96-A-0039, 1997 Ohio App. LEXIS 1682, 9-10. *Page 13 
 {¶ 44} Quite simply, this is not a case where appellant's counsel failed to call witnesses or failed to establish a defense. Appellant has failed to demonstrate how the failure to call these witnesses, in light of their probable testimony was so unreasonable and that it prejudiced his case to such a great degree that his counsel provided ineffective assistance. We cannot say this decision was so prejudicial that appellant was deprived of effective assistance of counsel.
 {¶ 45} Appellant's first assignment of error is without merit.
 {¶ 46} Appellant's State of Mind
 {¶ 47} In his second assignment of error appellant contends that he was denied his right to due process when he was prohibited from introducing evidence of his knowledge of Rush, which led him to be fearful for his life. Specifically, appellant argues that the court erred in failing to permit him to introduce redacted portions of his police interview to the jury; and that he was denied a fair trial when he was prohibited from testifying about his basis for his fear of Rush. We disagree with these contentions.
 {¶ 48} "The determination to admit or exclude evidence is within the sound discretion of the trial court and will not be reversed by an appellate court absent a showing of an abuse of discretion." State v.Sledge, 11th Dist. No. 2001-T-0123, 2003-Ohio-4100, ¶ 20, citingState v. Rootes (Mar. 23, 2001), 11th Dist. No. 2000-P-0003, 2001 Ohio App. LEXIS 1391, at 4-5, citing Renfro v. Black (1990),52 Ohio St.3d 27, 32. Abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Id. citing State v. Montgomery (1991),61 Ohio St.3d 410, 413, quoting State v. Adams (1980), 62 Ohio St.2d 151,157. *Page 14 
 {¶ 49} "To establish self-defense, a defendant must prove the following elements:
(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." Sledge at ¶ 23, citing State v. Barnes (2002),94 Ohio St.3d 21, 24, citing State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus.
 {¶ 50} Appellant argues that the redacted portions of his police interview should have been shown to the jury because his statements to the police regarding Rush's character in the community were important to establish his fearful state of mind.
 {¶ 51} The following redacted portions were proffered into the record:
 {¶ 52} "Officer: And you can talk up, because it's just me and you.
 {¶ 53} "Appellant: Okay. First off, he was — he's a crack dealer. I don't know if you guys know his background or not or do you check?
 {¶ 54} "Officer: We check, (Inaudible) check.
 {¶ 55} "Appellant: But he's a crack dealer and Jen was over there with my son, you know.
 {¶ 56} "* * *
 {¶ 57} "Appellant: He runs with a crew and they don't fuck around. They carry guns. They don't mess around. They say they are going to do something, they do something.
 {¶ 58} "* * *
 {¶ 59} "Appellant: I guess it first started out as a crack dealer. *Page 15 
 {¶ 60} "* * *
 {¶ 61} "Officer: Why not?"
 {¶ 62} "Appellant: Because I told you, he — he was a big drug dealer, okay? There were people working for him and everything like that, so he has connections somewhere."
 {¶ 63} There is no question that "[a] defendant, when arguing self-defense, may testify about specific instances of the victim's prior conduct known by the defendant, in order to establish the defendant's state of mind." State v. Marsh (Oct. 20, 1995), 11th Dist. No. 93-T-4855, 1995 Ohio App. LEXIS 4625, 10, citing McGaw v. State (1931), 123 Ohio St.196. "These events are admissible in evidence, not because they establish something about the victim's character, but because they tend to show why the defendant believed the victim would kill or severely injure him." Id. citing State v. Carlson (1986),31 Ohio App.3d 72, 73, citing State v. Randle (1980), 69 Ohio App.2d 71, 73. Thus, evidence of the victim's character offered to show the defendant's state of mind falls outside the boundaries of character evidence, Evid.R. 404 and 405, and instead is governed by the general evidentiary rules of admissibility, Evid.R. 401 and 403.
 {¶ 64} Before the trial court admitted these statements, which have no basis in any fact, the trial court was required to balance the probative versus prejudicial effects this evidence would have on the jury. The record is silent as to whether the trial court ultimately deemed these statements as too prejudicial to be admitted. The only mention of these statements, also discussed infra, in appellant's third assignment of error, was in the trial court's judgment entry that denied appellant's motion for new trial. The trial *Page 16 
court found these statements to be inadmissible since they constituted "self-serving hearsay." While, these statements may be self-serving hearsay, they fall outside of the purview of hearsay, since they are not being offered for the truth asserted, but rather to reflect appellant's state of mind and that he had a reasonable fear of Rush.
 {¶ 65} Regardless, we find these statements to be quite prejudicial versus their slight probative insight as to appellant's fear of Rush. There is nothing to indicate that Rush was a crack dealer, and this fact has no bearing or relation as to why appellant was fearful of Rush. Even if the trial court abused its discretion in redacting this testimony from appellant's video police interview, the error is harmless since appellant testified numerous times to his knowledge of Rush that had direct bearing on his fearful state of mind. Specifically, appellant testified that he knew appellant carried a weapon, that Rush had made threats against him, and that Rush ran "with a crew." Appellant also testified that two days prior to this he stayed at a hotel with Gedeon and the baby specifically because they were trying to evade Rush out of fear that he would hunt appellant down. Thus, the record is replete with testimony from appellant that he feared Rush because Rush made prior threats against him and was known to carry a weapon.
 {¶ 66} Secondly, appellant argues that he should have been allowed to introduce Rush's criminal record as evidence to establish his fearful state of mind. A defendant may only introduce specific instances of a victim's prior conduct that are known to the defendant at the time of the incident. Marsh at 10. Besides appellant's blind allegations that Rush was a crack dealer, there is no evidence that appellant knew of Rush's prior convictions, nor was Rush ever convicted for dealing "crack." Rather, Rush had a prior record that consisted of convictions for robbery, aggravated robbery, felonious assault, *Page 17 
receiving stolen property, possession of drugs, and he was classified as a sexual predator. Rush's conviction record has no bearing on appellant's fearful state of mind and is irrelevant absent proof of communication that appellant knew of these convictions beforehand and that they influenced him accordingly.
 {¶ 67} Appellant's second assignment of error is without merit.
 {¶ 68} Motion for New Trial
 {¶ 69} In his third assignment of error, appellant contends that he was denied due process of law when the trial court overruled his motion for new trial. Appellant argues that a new trial should have been granted because he was prevented from introducing any evidence that demonstrated his state of mind at the time of the incident. Specifically, appellant raises four issues: that the court erroneously redacted the portions of his taped police interview; that he should have been permitted to cross-examine state's witness, Shelia Moton, about the victim's character pursuant to Evid.R. 404(A)(2) and 405; that he should have been permitted to introduce "evidence" of the victim's character by way of reputation and opinion testimony and specific instances of conduct; and fourth, that he should have been permitted to testify as to what Gedeon told him about the character of the deceased. We reject these contentions finding them to be without merit. We also note that appellant offers no legal support for this assignment of error.
 {¶ 70} As the Ohio Supreme Court stated in State v. Schiebel (1990),55 Ohio St. 3d 71, paragraph one of the syllabus, "[a] motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on *Page 18 
appeal absent an abuse of discretion." See, also, In re Sechler (Aug. 29, 1997), 11th Dist. No. 96-T-5575, 1997 Ohio App. LEXIS 3886, p. 18.
 {¶ 71} In denying appellant's motion for new trial, the trial court found that appellant did not demonstrate that his substantial rights were materially affected by the exclusion of certain evidence. We agree. Specifically, in the first issue appellant raises, that of the redacted portions of his video interview (which we also discuss in assignment of error two, supra) the trial court concluded that because appellant did not indicate how he learned of this information about Rush and because he did not indicate he had any personal encounters with Rush, the court found the statements were self-serving hearsay statements, and as such, excluded them.
 {¶ 72} While we disagree with the court's conclusion that these statements were self-serving hearsay, we nonetheless find these statements were properly excluded because of their prejudicial effect and low probative value. These statements are not self-serving hearsay statements since they are not being asserted for the truth of the matter, but rather, are offered to demonstrate appellant's state of mind. Even if we did find the exclusion of these statements to be in error, the error would be harmless since appellant provided ample testimony that he was in fear of Rush because Rush made threats against him and carried a weapon.
 {¶ 73} Secondly, appellant argues that he was prevented from cross-examining state witness, Sheila Moton, as to Rush's character. More specifically, the transcript reveals that during trial appellant sought to cross-examine Moton on Rush's prior convictions. Appellant argued that because Ms. Moton testified on direct examination that she has known Rush "continuously" since she was nine or ten years old that she *Page 19 
put Rush's character into issue. Thus, appellant wanted to inquire as to what type of contact Moton and Rush have had over the past twenty years.
 {¶ 74} The trial court ruled that "continuously" did not put Rush's character into issue because it was not an opinion. The court then reminded appellant's counsel that the window on which appellant was permitted to cross-examine Ms. Moton was a narrow one. That is, only the facts and circumstances at the time appellant and Gedeon had contact with Rush were in issue. By proceeding down this line of questioning, appellant intended to open the door to Rush's prior convictions, which was excluded from being introduced into evidence before trial when the court granted the state's motion in limine. Further, in denying appellant's motion for new trial, the trial court found that any knowledge on the part of Ms. Moton as to the character of the victim is not the same as appellant's knowledge of Rush's character.
 {¶ 75} Evid.R. 404 and 405 govern the introduction of character evidence.
 {¶ 76} Pursuant to Evid.R. 404(A), character evidence is typically not admissible for the purpose of proving that a person acted in conformity on a particular occasion, unless an exception applies, including the following exception, which states, in relevant part:
 {¶ 77} "(2) Character of the victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible. * * *" *Page 20 
 {¶ 78} The form of such character evidence is limited by Evid.R. 405, which states:
 {¶ 79} "(A) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
 {¶ 80} "(B) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.
 {¶ 81} "It is undisputed that a defendant can introduce character evidence by reputation or opinion testimony under Evid.R. 405(A)."State v. Barnes (2002), 94 Ohio St. 3d 21, 24. See, e.g., State v.Baker (1993), 88 Ohio App.3d 204, 210-211. However, "a defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor." Id. at 25. Appellant fails to realize that the state did not put Rush's character into evidence because Moton did not give an opinion as to Rush's reputation. Further, if appellant wanted to question Moton on Rush's reputation by way of specific acts as proof of his own state of mind, he was required to first prove that he had prior knowledge of those instances, which he did not do. "Where evidence of the victim's violent character is offered as a factor bearing upon the defendant's state of mind, evidence of specific instances of conduct is admissible,but only if it can be shown that the defendant had knowledge of suchspecific instances of conduct." State v. Woodruff (Dec. 31, 1997), *Page 21 
11th Dist. No. 96-L-111, 1997 Ohio App. LEXIS 6036, 10, citing State v.Schmidt (1979), 65 Ohio App.2d 239. (Emphasis added.)
 {¶ 82} With respect to the third issue raised, appellant argues he was prevented from testifying about what Gedeon relayed to him regarding Rush, the threats he made against appellant, and the fact that Gedeon informed him Rush carried a gun. The trial court found that any testimony by appellant regarding what Ms. Gedeon had relayed to him would have constituted impermissible hearsay and that if Ms. Gedeon had testified herself, her statements may have fallen under the hearsay exception that allows for statements showing appellant's state of mind. Furthermore, since appellant did not call Ms. Gedeon as a witness, the court found that appellant could not now claim he was prejudiced for the failure to do so.
 {¶ 83} We noted in appellant's second assignment of error, supra, that appellant testified numerous times that he knew Rush had a gun and that Rush had made threats against him. Furthermore, if Rush had testified as to what Gedeon relayed to him, there are obvious inconsistencies between his testimony and Gedeon's police interview. Thus, the trial court properly excluded this testimony.
 {¶ 84} Finally, appellant argues that he should have been permitted to present evidence as to the victim's character through reputation or opinion and specific instances of conduct. We do not find the trial court abused its discretion as appellant has failed to indicate what evidence he sought to offer through "opinion and/or reputation testimony or specific instances of conduct" and to what end he sought to offer this evidence, whether it was to evidence that Rush was the initial aggressor, had a propensity for violence, or if he was trying to offer this evidence to demonstrate his state *Page 22 
of mind. We note that "a defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor." Barnes at 25. In addition, specific acts of conduct may only be introduced where character constitutes an element of a charge. The victim's character is not an essential element of self-defense. Indeed, "[a] defendant may successfully assert self-defense without resort to proving any aspect of a victim's character." Id. at 24. Without knowing what evidence appellant sought to introduce, we cannot find that the trial court abused its discretion.
 {¶ 85} In any case, the evidence overwhelmingly supports a finding of appellant's guilt. Appellant cannot claim that but for these statements, he would be acquitted. Thus, we agree with the trial court that no statements were excluded that materially prejudiced appellant or affected his substantial rights.
 {¶ 86} Appellant's third assignment of error is without merit.
 {¶ 87} Character Evidence of the Victim
 {¶ 88} In his fourth assignment of error appellant contends that he was denied due process of law when the state was permitted to introduce certain evidence through Ms. Coolidge ("Coolidge"), the property manager of Queensdale. Specifically, appellant argues that the trial court erred in allowing Coolidge to testify that Rush was a "nice guy"; that appellant was a problem tenant who fought with Gedeon constantly; that appellant failed to pay rent and had been evicted; and that appellant had accused Coolidge of "whoring around" with Gedeon. We disagree and note that once again, appellant has failed to substantiate his arguments with any legal authority. *Page 23 
 {¶ 89} The issues raised in this assignment of error concern the testimony of Coolidge, who testified for the state and was the property manager of Queensdale apartments. Specifically, in the first issue raised, appellant argues that his counsel failed to object to Coolidge's testimony that Rush was a "nice guy."
 {¶ 90} However, the transcript actually reveals that appellant's counsel did object. The state then strategically withdrew the question as the following colloquy will demonstrate:
 {¶ 91} "Ms. Linden [counsel for the state]: Now you said that Michael Rush lived there, do you recall where he lived?
 {¶ 92} "Ms. Coolidge: He lived in A-117.
 {¶ 93} "Ms. Linden: What kind of tenant was he?
 {¶ 94} "Ms. Coolidge: He was very quiet, he was very nice, he always paid his rent on time."
 {¶ 95} "Mr. Talikka [Appellant's counsel]: Objection.
 {¶ 96} "* * *
 {¶ 97} "Court: Well, approach the bench counsel.
 {¶ 98} Thereupon, the following occurred at the bench between counsel and the court, outside of the hearing of the jury:
 {¶ 99} "Court: I don't know if I would have objected.
 {¶ 100} "Mr. Talikka: Well, I withdraw my objection, Your Honor. I'm going to withdraw my objection.
 {¶ 101} "Court: We're going to get into a character battle.
 {¶ 102} "Mr. Talikka: I withdraw my objection. *Page 24 
 {¶ 103} "Ms. Linden: In terms of being a tenant and not what kind of a person he was what kind of tenant he was.
 {¶ 104} "Mr. Talikka: He was a nice guy that's the answer.
 {¶ 105} "Court: Yes, I'm not making the testimony, if you want to bolster the victim's credibility and raise the issue of credibility that's up to you, maybe you have a reason for it.
 {¶ 106} "Ms. Linden: No, Your Honor.
 {¶ 107} "Mr. Bartolotta [counsel for state]: Just withdraw it and move on.
 {¶ 108} "Mr. Talikka: I withdraw the objection.
 {¶ 109} Thereupon, the following occurred in open court, within the presence and the hearing of the jury:
 {¶ 110} "Ms. Linden: Your Honor, we withdraw the last question."
 {¶ 111} Thus, although the court did not instruct the jury to disregard the last question, there was no request for a curative instruction, and the question was withdrawn. Thus, the door was not opened for cross-examination of Coolidge on Rush's character since his character was never placed into issue. Further, the question was withdrawn on the record.
 {¶ 112} Rather than ask the court to instruct the jury to disregard the question, appellant's counsel began his cross-examination of Coolidge with the following colloquy:
 {¶ 113} "Mr. Talikka: Miss Coolidge, I interrupted you earlier but you were going to say something about Michael Rush being a nice guy?
 {¶ 114} "Ms. Linden: Objection, Your Honor.
 {¶ 115} "Ms. Coolidge: Yes. *Page 25 
 {¶ 116} "The Court: Sustained.
 {¶ 117} "Mr. Talikka: What were you going to say?
 {¶ 118} "Mr. Talikka: Pardon.
 {¶ 119} "The Court: Sustained.
 {¶ 120} "Mr. Talikka: There was a lease between Jennifer and Mr. Hudson, is that correct?"
 {¶ 121} Secondly, appellant contends that Coolidge testified that appellant was a problem tenant who fought with Gedeon constantly, had failed to pay rent and been evicted, and had accused the female property manager of "whoring around" with Gedeon. Although these statements are found in Coolidge's testimony, appellant takes them out of context. Specifically, with regard to appellant as a "problem tenant", Coolidge was actually testifying as to how she became familiar with appellant and Gedeon. Coolidge replied that she became acquainted with appellant and Gedeon because she had several problems with them as tenants and went through an eviction proceeding with them several weeks prior to the shooting. Furthermore, this testimony was important to lay a foundation that Coolidge knew appellant, Gedeon, and Rush. Coolidge observed Gedeon enter Rush's apartment on the day of the incident, around the time she told appellant she was going tanning. Appellant cannot now claim that his counsel failed to object because he does not agree with his counsel's strategy nor can appellant now claim that Coolidge's testimony concerning his eviction and noise complaints with Gedeon constituted prejudicial error. "When addressing prejudice, a court must observe whether "there is a reasonable doubt that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."Strickland at 695. *Page 26 
 {¶ 122} Even if we were to find the trial court in error, we would not find an abuse of discretion since they would be harmless error. Indeed, the evidence is overwhelmingly in favor of appellant's guilt since appellant has failed to establish a valid claim of self-defense.
 {¶ l23} A defendant must prove by a preponderance of the evidence: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." Sledge at ¶ 23, citing Barnes at 24. Thus, in order to establish a valid self-defense claim, appellant was required to prove that he was not the initial aggressor, which he clearly failed to do.
 {¶ 124} The evidence presented by both the state and appellant's own testimony clearly demonstrated that upon observing Rush in his driveway he went to the hall closet where he retrieved and loaded his father's gun. Instead of locking the door and calling the police, he then proceeded to the front door and yelled at Rush: "Hey nigger, get off my lawn." Next, appellant picked up a rock and threw it at Rush's jeep. Thus, appellant failed to carry his burden of proof on his self-defense claim, and any error regarding Coolidge's testimony as to Rush's character was harmless.
 {¶ 125} Appellant's fourth assignment of error is without merit.
 CYNTHIA WESTCOTT RICE, P.J., DIANE V. GRENDELL, J., concur. *Page 1