OPINION
{¶ 1} Appellant, Richard A. Jones, Jr., appeals his conviction and the denial of his motion for new trial in the Lake County Court of Common Pleas, following a jury trial, in which he was found guilty of aggravated burglary, aggravated robbery, and felonious assault. At issue is whether the trial court abused its discretion in denying appellant's motion for new trial. For the reasons that follow, we affirm.
 {¶ 2} On May 25, 2007, the grand jury returned an indictment charging appellant with aggravated burglary by inflicting or attempting to inflict physical harm on *Page 2 
Duane Derrick and/or Richard Sage, a felony of the first degree, in violation of R.C. 2911.11(A)(1) (Count 1); aggravated burglary with a deadly weapon, a felony of the first degree, in violation of R.C. 2911.11(A)(2) (Count 2); aggravated robbery while using a deadly weapon, a felony of the first degree, in violation of R.C. 2911.01(A)(1) (Count 3); aggravated robbery by inflicting or attempting to inflict serious physical harm on Duane Derrick, a felony of the first degree, in violation of R.C. 2911.01(A)(3) (Count 4); felonious assault with a deadly weapon, a felony of the second degree, in violation of R.C. 2903.11(A)(2) (Count 5); and felonious assault by causing serious physical harm to Duane Derrick, a felony of the second degree, in violation of R.C. 2903.11(A)(1) (Count 6).
 {¶ 3} The case was tried to a jury from October 15, 2007 to October 17, 2007. Richard Sage testified that early Christmas morning, December 25, 2006, he was at his home at the Willow Park Apartments, on Euclid Avenue, apartment B208 in Willoughby, Ohio, where he was living with his mother Bonita Sage and a friend Duane Derrick.
 {¶ 4} At about 4:30 a.m., Richard heard a loud knock at the door. He looked out the peephole in the door and saw appellant at the door with an unknown male wearing a black hooded sweatshirt standing behind him. Richard walked to the rear bedroom where Duane was staying because he knew appellant better than Richard did. Richard attempted to wake Duane, who was sleeping on a couch in his room, but was unable to do so.
 {¶ 5} Appellant began knocking louder at the door. As Richard was going back into the living room, his mother was about to unlock the front door when Richard told her not to. Appellant then forcibly pushed the door in and knocked Bonita into the kitchen. *Page 3 
Richard ran back into Duane's bedroom yelling for him to wake up and Duane jumped up. Appellant and the second male burst into Duane's room. Duane pulled out his .38 revolver, which he kept under the couch. The second male went toward Duane, and appellant hit Richard in the face with a crowbar he had brought into the room.
 {¶ 6} Appellant then attacked Duane and in the struggle, the gun fired and a bullet went into the wall. Appellant eventually took the gun, got on top of Duane, and started beating him in the head with the gun. At the same time the second male was hitting Duane in the back with the crowbar. Appellant then said, "Fuck this shit, get the safe." The accomplice leaned over the couch; grabbed Duane's safe; and then left the room with the safe, with appellant following him.
 {¶ 7} Richard testified that appellant had broken in the door leading into the apartment and that parts of the wood door frame were on the floor. Richard's eye swelled up as a result of appellant striking him in the face with the crowbar and Richard also sustained cuts to his arm.
 {¶ 8} Duane Derrick testified that he was asleep on the couch in his bedroom when he heard the front door being kicked in. He got up and reached for his .38 revolver, which he kept under the opposite end of the couch. Two men burst in his room and got on top of him. He recognized one of them as appellant, a friend he had known for years. The second male, who was wearing a hood and who was unknown to him, struck him from behind with a crowbar. He was struck first in the back and then in the back of his head. Duane went toward the door when he was hit again with the crowbar and he fell. As he was falling, he pointed the gun in the direction of "figures" because, due to the blows to his head, that was all he could see. He fired the gun to *Page 4 
get them off of him. When he hit the ground, he blacked out for a second. He dropped his gun and appellant picked it up and hit Duane with it in the back of his head. Appellant told his accomplice, "grab the safe," and he complied. The male wearing the hood ran out of the apartment holding the safe, with appellant running after him. Duane testified he had more than $10,000 in the safe, which included his savings over several years and an inheritance from his grandfather.
 {¶ 9} Duane testified he was taken to the hospital by ambulance. He had sustained a serious head injury that required five staples to close. He also sustained a cut behind one ear, a cut on the top of the back of his head, and injuries to his back from being hit with the crowbar. He still has a scar on the top of the left side of his head and a scar on the crown of his head from this attack.
 {¶ 10} Duane testified that, prior to this incident, appellant had been to his apartment countless times. Appellant had also been in his room several times and knew Duane had a safe which he kept under his couch. Duane said that on one occasion two weeks before the burglary, appellant was in his room. Duane opened the safe and appellant saw its contents.
 {¶ 11} Bonita Sage, Richard's mother, testified that she was awakened by a noise at the front door. She looked through the peephole and saw appellant and two other males at the door. As she started to open the door, Richard came out of the back room and shook his head, indicating that she should not open the door. As she walked away from the door, it was forced open and it knocked her into the kitchen, causing her to hit the cabinets. Two of the three males came into the apartment and went directly toward Duane's room. *Page 5 
 {¶ 12} As she walked down the hall to Duane's room, she heard gunfire. When she walked into his room, she saw appellant hitting her son Richard with a crowbar at the window and he was nearly unconscious. At that time another male, who was unknown to Bonita and who was wearing a hood, was attacking Duane. He was hitting Duane with a gun in his head and in his back. She told appellant to stop hitting Richard and she threw a drinking glass at his head in an effort to get him to stop. When she threw the glass at appellant, it broke and appellant stopped attacking Richard who was on the floor. Appellant and his accomplice then attacked Duane together. Duane said, "they're going to kill me, Richard, help me." Bonita then picked up a speaker and hit the other male over the head with it, trying to get him to stop beating Duane. The accomplice then turned around and looked at Bonita, and one of the intruders said, "get the safe." They went behind the couch and then left.
 {¶ 13} Bonita testified that she injured her foot on the glass she threw and, as a result, her toe was almost severed from her foot. Her injury was so severe, she was required to undergo surgery.
 {¶ 14} Officer Terrell Stevenson of the Willoughby Police Department testified he was dispatched to apartment B208 to investigate. He said he was able to walk into the apartment because the door was open. The door to this apartment appeared to have been forced open. He met with the victims. Bonita Sage had a bandage on her foot; Richard Sage had a large lump over his eye; and Duane Derrick's head was bleeding and he said he could not see. Off. Stevenson called the rescue squad for all three of them, and they were transported to the hospital. *Page 6 
 {¶ 15} Sergeant John Dalheim of the Willoughby Police Department testified he was dispatched to the scene that morning. He was in charge of maintaining the integrity of the crime scene. He said the outside entrance door to Building B had been pried open. The cover to the outside overhead light fixture had been taken off and was on the ground. The light bulb inside had been removed and discarded in the grass a few feet away. Inside apartment B208, Sgt. Dalheim collected a crowbar he found on the floor in the hallway just outside Duane's bedroom.
 {¶ 16} Officer John Sweitzer of the Willoughby Police Department testified that he was also dispatched to the scene. He testified the door to apartment B208 appeared to have been broken into. It looked like the door had been kicked in. There were pry marks next to the door handle.
 {¶ 17} Willoughby Police Detective John Begovic testified that on December 25, 2006, he got a call from Willoughby dispatch, asking him to assist in the investigation. He said the entrance door to apartment B208 had been forced open. The door jamb was cracked and the door and its lock were damaged. There were pry mark impressions in the wood from a pry bar tool.
 {¶ 18} Det. Begovic testified the outside entrance door to Building B is secured and entrance is obtained with a key. Once inside, one would select the buzzer for the apartment desired. One would press the buzzer and if the tenant wanted to allow the person to enter, he would press the button in his apartment to disengage the interior entrance door. Det. Begovic testified he lifted pry marks from the outside entrance door and the door to apartment B208, and these marks with the crowbar found at the scene were submitted to the Lake County Crime Laboratory for analysis. David Green, *Page 7 
forensic scientist with the Lake County Crime Laboratory, testified that, based on his analysis, the toolmark impressions left at the outside entrance door to Building B were made by the crowbar submitted for analysis by Det. Begovic. However, the impressions lifted from the entrance door to apartment B208 were insufficient for definitive comparison.
 {¶ 19} Detective Begovic obtained an arrest warrant for appellant on December 27, 2006. On January 18, 2007, appellant turned himself in. As part of the booking process, inmates are asked questions about their medical condition and history. When asked if he had sustained a recent head injury, at first appellant said no. Then he changed his story and said he had been shot in the head and grazed by a bullet. He said he had not sought medical attention or reported the incident to police. When asked for the date of this injury, he said December 20, but stopped short of giving the full date.
 {¶ 20} Detective Thomas Trem of the Willoughby Police Department testified he found blood droplets at the scene. He took blood samples he found in the stairwell leading to the outside entrance door and in apartment B208. Dr. Steve Labonne, DNA technical manager of the Lake County Crime Laboratory, testified that the blood samples submitted for analysis belonged to Duane Derrick and one contained appellant's DNA.
 {¶ 21} On October 15, 2007, the first day of trial, the prosecutor and defense counsel gave their opening statements, and the state presented the testimony of both victims Richard Sage and Duane Derrick as well as the testimony of the Willoughby Police dispatcher, Off. Stevenson, and Sgt. Dalheim. Following this testimony, the judge ordered the jury, counsel and the parties to report to court for trial the following *Page 8 
day, October 16, 2007, at 9:15 a.m. On the following day, appellant failed to appear, and the court found appellant had voluntarily absented himself from the proceedings. The court revoked appellant's bond; issued a bench warrant; and proceeded to try appellant in absentia.
 {¶ 22} Appellant also failed to appear for the third day of his trial. Following the presentation of all evidence on October 17, 2007, the case was submitted to the jury, which returned a verdict of guilty on all six counts of the indictment. The court indicated it would defer sentencing until after appellant was apprehended.
 {¶ 23} On October 30, 2007, appellant's trial counsel Richard Morrison moved to withdraw as counsel of record and the motion was granted. On October 31, 2007, appellant, through his new counsel, Albert Purola, filed a motion for new trial. An oral hearing was held on the motion for new trial on November 15 and December 21, 2007 and on February 7, 2008, after which the court announced its decision denying the motion. The court entered its judgment denying the motion on February 13, 2007.
 {¶ 24} The trial court sentenced appellant to ten years in prison on Count 1, ten years in prison on Count 2, ten years in prison on Count 3, ten years in prison on Count 4, eight years in prison on Count 5, and eight years in prison on Count 6, with all sentences to be served concurrently. Appellant timely appeals his conviction and the trial court's denial of his motion for new trial, asserting two assignments of error. For his first assignment of error, appellant states:
 {¶ 25} "THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL * * * IN THE FOLLOWING PARTICULARS: (A) CONTINUING THE TRIAL WITHOUT THE DEFENDANT BEING PRESENT, (B) NOT CREDITING THE NEWLY *Page 9 
DISCOVERED EVIDENCE, AND (C) HOLDING TRIAL COUNSEL'S CONDUCT WAS NOT DEFICIENT."
 {¶ 26} As the first issue under his assignment of error, appellant argues the trial court abused its discretion by proceeding with the trial after appellant had failed to return to court after sitting through the first full day of trial. Appellant argues the trial court did not investigate the reasons for his failure to appear sufficiently to determine whether his absence was voluntary. We do not agree.
 {¶ 27} Crim. R. 43(A) provides in pertinent part: "* * * In all prosecutions, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the verdict. * * *"
 {¶ 28} First, we note that appellant has failed to present this court with any authority for the proposition that, in the circumstances confronting the trial court, the court abused its discretion in proceeding with the trial. Based upon our research of the case law, the trial court acted well within its authority in continuing the trial after appellant absented himself from the proceedings.
 {¶ 29} It is well established that a defendant's right to be present at trial is not absolute. State v. White, 82 Ohio St.3d 16, 26,1998-Ohio-363.
 {¶ 30} This court addressed the issue of whether a defendant's absence is voluntary in In re Ruth (June 19, 1998), 11th Dist. No. 96-A-0086, 1998 Ohio App. LEXIS 2773, as follows:
 {¶ 31} "This court is aware of the predicament a trial court is faced with when an accused fails to return for the conclusion of the proceedings against him. In such circumstances, the trial court is placed in the unenviable position of having to determine *Page 10 
whether or not to continue the proceedings without the accused, often with little or no evidence as to the reasons for the defendant's absence. However, the voluntariness of an accused's nonappearance is an issue of fact, and the court is permitted to find that a defendant's absence was voluntary when there is unrebutted evidence that the accused was aware of his obligation to attend the court's proceedings. State v.Carr (1995), 104 Ohio App.3d 699, 703 * * *." Ruth at *9.
 {¶ 32} In Carr, the Second Appellate District held:
 {¶ 33} "Crim. R. 43(A) rests on the presumption that a defendant who is present at trial knows of his obligation to attend court throughout the trial proceedings. * * *.
 {¶ 34} "* * *
 {¶ 35} "If counsel has no explanation for the defendant's absence, the trial court may nevertheless find the absence to be voluntary because the presumption that the defendant knows of his obligation to attend has gone unrebutted." Id. at 703.
 {¶ 36} The Eighth Appellate District considered a case strikingly similar to the one at hand in State v. Jones, 8th Dist. No. 84570, 2005-Ohio-397. In Jones, the defendant's trial on aggravated robbery charges began on March 8, 2004. On March 9, 2004, the defendant failed to appear for trial, which was scheduled to begin at 2:00 p.m. The trial court gave defense counsel opportunities to contact the defendant. At 2:30 p.m., the trial court asked defense counsel if he had tried to contact the defendant and counsel stated he had. Counsel conceded that at the end of the proceedings the previous day, the trial court told everyone on the record that court would reconvene at 2:00 p.m. the following day, but that his client was not present. Counsel stated that he had checked several times; it was now slightly after 2:30 p.m.; and appellant was still *Page 11 
not in court. Further, the trial court in that case noted that counsel was never contacted by the defendant. After these attempts to find the defendant failed, the court concluded that he had waived his right to be present and proceeded with the trial. The Eighth District held:
 {¶ 37} "The [trial] court properly considered the following: that trial had begun the day before, the jury was empanelled, appellant had been advised repeatedly of the time trial was to resume, attempts were made to contact him, and appellant had not attempted to contact any party in the case. The court, and more importantly the jury, need not delay when a defendant clearly waives his right to be present. We find the court did not abuse its discretion." (Footnote omitted.) Id. at ¶ 13.
 {¶ 38} Our review of the record indicates that at the end of the first day of trial, October 15, 2007, the judge told the jury, counsel, and appellant that they were to report for trial the following day, October 16, 2007, at 9:15 a.m.
 {¶ 39} On October 16, 2007, appellant failed to appear at the scheduled time. At 9:50 a.m., the judge stated on the record that appellant was still not present. The court indicated it had told the jurors, attorneys, and the parties to be present at 9:15 a.m. and that after waiting for appellant for 35 minutes, appellant still had not appeared. The court asked appellant's counsel Mr. Morrison if he had attempted to contact appellant. Mr. Morrison stated he had tried to contact appellant by calling his mother, with whom appellant resided, but that he was unable to leave a message on her phone. He said he had also called the house of appellant's grandmother and left a message for appellant or anyone in his family to call the court and he provided the court's phone number. *Page 12 
 {¶ 40} The court then obtained appellant's home address from Mr. Morrison, and asked Det. Begovic to send a police cruiser to appellant's home to see if he was there and, if so, to take appellant into custody and bring him to court.
 {¶ 41} The judge also asked Det. Begovic to call the two local hospitals, Lake East Hospital and Lake West Hospital, to see if appellant had been brought into the emergency room of either hospital.
 {¶ 42} The prosecutor advised the judge that appellant occasionally stays at his grandmother's house in Eastlake. The judge asked Det. Begovic if he could have the Eastlake Police Department check her address and, if there, to take appellant into custody and bring him to court.
 {¶ 43} Mr. Morrison asked for a one-hour continuance of the trial. The court left the bench and then returned on the record at 10:18 a.m. Det. Begovic reported to the court that the Eastlake dispatcher had called him and said that no one had answered the door at the house of appellant's grandmother and there were no vehicles there. The detective also reported that the Willoughby dispatcher had advised him that appellant had not been to either of the local hospitals. The detective reported that uniformed officers went to the home of appellant's mother Cheri Dillon. She advised them that appellant was not there and that she was leaving to look for him. The officers asked her if they could check for appellant in her house and she refused to allow them to enter.
 {¶ 44} The judge then asked Mr. Morrison if he had heard anything back from appellant or his family and Mr. Morrison stated he had not. *Page 13 
 {¶ 45} At 10:20 a.m., more than one hour after trial was scheduled to resume, the judge revoked appellant's bond due to his failure to appear for trial and issued a bench warrant for his arrest.
 {¶ 46} Mr. Morrison then asked for a one-day continuance. The court stated it had scheduled 12 sentences for the following day, and another trial on the date after that, and that if he granted the request, he would have to reschedule all these matters. The following exchange took place between the judge and appellant's counsel:
 {¶ 47} "[THE COURT] * * * [I]t's pretty much contempt of court and flight to avoid seeing the trial that maybe he thinks is going badly for him. * * * I don't know what he's thinking. But he's not here. He clearly knew what time he was to be here. In fact, everybody in his family knew what time to be here, because they were in the courtroom. And nobody's here. * * * Is that a coincidence? * * * [W]hat can I draw from that? They know he's not going to be here. Right?
 {¶ 48} "RICHARD MORRISON: It appears that way, sir."
 {¶ 49} The jury was then brought back into court at 10:26 a.m. and the trial proceeded. Toward the end of the day, the following exchange took place between the court and counsel:
 {¶ 50} "[THE COURT]: Have you heard from your client?
 {¶ 51} "RICHARD MORRISON: No I haven't.
 {¶ 52} "[THE COURT]: Not a word?
 {¶ 53} "RICHARD MORRISON: No.
 {¶ 54} "[THE COURT]: And I see his family's no longer present.
 {¶ 55} "RICHARD MORRISON: No. *Page 14 
 {¶ 56} "* * *
 {¶ 57} "[THE PROSECUTOR]: * * * It's now 2:54 [p.m.]
 {¶ 58} "[THE COURT]: A few hours late.
 {¶ 59} "* * *
 {¶ 60} "RICHARD MORRISON: Yeah.
 {¶ 61} "[THE COURT]: Sort of moots out the request for continuance. And the record should also reflect that he was given the number for the court, or relatives were given the number for the court, and the court has received no phone calls.
 {¶ 62} "* * *
 {¶ 63} "[THE COURT]: So you've received no word from him?
 {¶ 64} "RICHARD MORRISON: Not to my knowledge, Judge, no."
 {¶ 65} At approximately 4:00 p.m., Mr. Morrison advised the court that he still had not heard from his client and he renewed his request for a continuance and alternatively asked for a mistrial. The following exchange then took place:
 {¶ 66} "[THE COURT]: * * * [S]ince we already empanelled a jury and your client knew that jeopardy attached * * *, he has voluntarily absented himself. * * * I have to assume that he has chosen not to be part of his process. * * * I told him personally to be here.
 {¶ 67} "RICHARD MORRISON: Yes.
 {¶ 68} "[THE COURT]: * * * [I]t's just striking that both of the family members that were here yesterday, how they knew not to appear today. Somehow they knew this trial wasn't gonna go forward, or at least their family member wasn't going to be present for that trial. And I'm wondering if there's some type of conspiracy to * * * hide him. *Page 15 
Because the information from the police was that they refused * * * admittance to have them look for him. * * * So I've taken whatever action I deemed necessary, and it was necessary to proceed in absentia. And I've been presented no legal authority that says that I cannot do that. You don't have any case * * * [t]hat says if the guy doesn't show up for his trial that he can thwart the system * * *.
 {¶ 69} "RICHARD MORRISON: No I don't, Judge."
 {¶ 70} At the beginning of the third day of trial, October 17, 2007, the court asked Mr. Morrison if he had heard anything from appellant and Mr. Morrison said he had not. The prosecutor advised the court that, pursuant to the court's order, the Willoughby Police Department continued to try to locate appellant and had been unable to do so. He advised that Det. Begovic had reviewed all recent police reports and had learned that as of that morning, there had been no missing person report filed for appellant and that appellant was not currently incarcerated in the Lake County Jail.
 {¶ 71} Contrary to appellant's argument, we do not agree that the trial court erred in not doing more to determine whether appellant's absence was voluntary. Based on this record, we cannot imagine what more the court could have done.
 {¶ 72} The undisputed evidence is that, at the conclusion of the first day of trial, appellant was aware he was required to attend the second day of trial at 9:15 a.m. Appellant failed to appear and his counsel did not offer any explanation for his absence. The same situation prevailed on the third day of trial. As a result, the record supports the trial court's finding that appellant's absence was voluntary and that he waived his right to be present. *Page 16 
 {¶ 73} Further, appellant's testimony during the hearing on appellant's motion for new trial demonstrates any further efforts by the trial court would have been futile. Appellant said that after the first day of trial, he decided not to return to court because, after hearing the testimony of the victims, he thought he was going to prison. He also said he was upset with his attorney, but he never advised his attorney or the court of any concerns. As a result, he went into hiding for several weeks. He stayed at a Super 8 motel and his mother provided the funds for him to stay there. He stayed for a few days at his grandmother's house. His brother Ray Dillon drove appellant across the state line to Climer, Pennsylvania where he was planning to stay and his brother offered him $70 until he found a job there. Appellant said he did not know his trial could continue without him being there, and he thought that by not attending, the trial would stop. Thus, even after he turned himself in, appellant never offered any legitimate reason for failing to attend the remainder of his trial.
 {¶ 74} Appellant ignored the advice of Attorney Ken Cahill and his mother after the first day of trial that he should come to court the next day. Appellant's testimony confirms his absence from trial was voluntary and that he waived his right to be present. As the trial court found, "the Defendant's absence was voluntary, and clearly a means for the Defendant to subvert the trial and try to avoid a conviction in light of the credible, persuasive and convincing evidence that the Defendant observed firsthand for himself on the first day of trial." We therefore hold the trial court did not abuse its discretion in finding that appellant had voluntarily absented himself from the trial.
 {¶ 75} For his second issue, appellant argues the trial court should have granted his motion for new trial based on newly discovered evidence. Crim. R. 33(A) provides *Page 17 
that a "new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: * * * (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."
 {¶ 76} The grant or denial of a motion for a new trial based on newly discovered evidence is within the sound discretion of the trial court, and this court will reverse only upon abuse of discretion. State v.Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. In order to find an abuse of discretion, we must determine that the trial court's decision was not merely an error of law or judgment; it must be found to have been unreasonable, arbitrary, or unconscionable. State v.Adams (1980), 62 Ohio St.2d 151, 157-158.
 {¶ 77} Crim. R. 33(B) provides in pertinent part: "Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered * * *. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period."
 {¶ 78} In State v. Rock, 11th Dist. No. 2005-L-005, 2005-Ohio-6291, this court held that a new trial may be granted where the newly-discovered evidence "`(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not *Page 18 
merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.'" Id. at ¶ 24, quoting State v.Petro (1947), 148 Ohio St. 505, syllabus. Moreover, this court inRock held that each of the Petro factors must be established before a new trial may be granted; if one or more of the factors cannot be met, the court need not consider the remaining factors. Rock at ¶ 29.
 {¶ 79} In the case sub judice, the alleged newly discovered evidence on which appellant relies is that after the burglary, he and his accomplices went to his brother Ray Dillon's house and told him that Duane had pulled a gun on them. Appellant argues this evidence shows there was no burglary.
 {¶ 80} Appellant testified that he along with his cousins Guy Pistininzi and Joe Gaston and his friend Paul Iseman went to Duane's apartment to purchase cocaine from him. He had been close friends with Duane for ten years and had often purchased cocaine from him. On several occasions when appellant did not have money to pay for the cocaine, Duane would allow him to pay later. He never had a problem with Duane before. He said Richard Sage buzzed him, Guy, and Paul in the apartment and they went into Duane's room. Guy allegedly paid $40, rather than the $100 on which appellant said they had agreed, and, according to appellant, Duane became enraged and pulled out a gun. Appellant said he grabbed it from Duane and in the struggle the gun went off, grazing Duane in the head. Appellant said he then got on top of Duane and began beating him with the gun. Appellant said Paul hit Richard in the face with a crowbar and then Paul attacked Duane with the crowbar while appellant was on top of him. Suddenly, for no apparent reason, appellant, Guy, and Paul ran out of the *Page 19 
apartment with Duane's gun. They then went to Ray Dillon's house and allegedly told him that Duane had pulled a gun on them.
 {¶ 81} Ray Dillon testified that on December 25, 2006, at 5:00 a.m., appellant, Guy, Paul and Joe came to his house and told him that Duane had pulled a gun on them. Ray admitted that in a taped telephone conversation between him and appellant, while appellant was in jail, appellant told Ray he had better do "more than talk" to his accomplices to get them to testify for him.
 {¶ 82} Joe Gaston was called to testify for the defense, but invoked his Fifth Amendment right not to incriminate himself. Paul Iseman testified that he never went to Duane's house and had never heard of him.
 {¶ 83} First, it cannot reasonably be disputed that appellant would have been aware of this version of events before the trial. In order to avoid this obvious impediment to a newly-discovered-evidence claim, appellant argues on appeal that because his attorney was unaware of the accomplices going to Ray's house that morning, it is irrelevant that he was aware of this evidence before the trial. However, both Crim. R. 33(A) and the cases cited supra, make it clear that in order to obtain a new trial based on newly discovered evidence, a defendant must show that he could not have discovered the new evidence and produced it at trial and that he was unavoidably prevented from discovering such evidence prior to the verdict. Thus, since appellant does not dispute that he was aware of this evidence prior to trial, the trial court did not abuse its discretion in denying appellant's motion for new trial.
 {¶ 84} Second, the alleged new evidence merely impeached or contradicted the testimony of the state's witnesses concerning appellant's invasion of their apartment on *Page 20 
Christmas morning. The state's witnesses testified that appellant and his unknown accomplice burst into their apartment, and, while beating Duane and Richard with Duane's gun and a crowbar, stole Duane's safe. Appellant offered a version that merely contradicted the victims' testimony concerning the burglary. For this additional reason, the trial court did not abuse its discretion in denying appellant's motion.
 {¶ 85} Third, by any reasonable standard, the alleged new evidence did not disclose a "strong probability that it [would] change the result if a new trial [was] granted." Petro, supra. Appellant has a lengthy criminal record. There was no reason why Duane would shoot him in his own apartment over $60, especially in light of their longstanding close relationship. The court found the testimony presented by appellant, his mother and brother Ray Dillon was not credible. Appellant's mother admitted that in a taped telephone conversation between her and appellant while he was in jail, she stated, "Joe Gaston better fucking come up with the fucking story because I'll tell you what, his life ain't safe." In contrast, the court found that Paul Iseman, who appellant called to testify on his behalf and who said he never went to Duane's apartment, was credible. Mr. Iseman also testified that after appellant was found guilty, appellant's mother and brother visited him. They told Mr. Iseman to come up with a story involving him as to what happened on Christmas morning. Cheri Dillon told him that if he did not say he was there with appellant, she would make sure he did the time appellant was supposed to serve in prison. Ray Dillon told Mr. Iseman he was not going to let his brother do time for this. Mr. Iseman reported these threats to police.
 {¶ 86} Further, the testimony offered by appellant and his mother and brother cannot be reconciled with the undisputed physical evidence found at the scene, e.g., the *Page 21 
broken outside light fixture and removed light bulb at the entrance door to Building B; the pry marks found on the exterior door to Building B made by the crowbar brought into the apartment by appellant; and the physical injuries sustained by Duane, Richard and Bonita. The alleged newly discovered evidence was so weak, incredible, and unpersuasive, we cannot conceive how, if offered at a new trial, it could change the result. For this additional reason, the trial court did not abuse its discretion in denying appellant's motion for new trial.
 {¶ 87} Finally, for his third issue under his first assigned error, appellant argues his trial counsel was ineffective in failing to sufficiently cross-examine the victims concerning alleged inconsistencies between their trial and preliminary hearing testimony and in failing to object to a comment made by the prosecutor in closing argument.
 {¶ 88} The standard of review for ineffective assistance of counsel is whether the representation of trial counsel fell below an objective standard of reasonableness and whether the defendant was prejudiced as a result of the deficient performance. The defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. State v.McKinney, 11th Dist. No. 2007-T-0004, 2008-Ohio-3256, at ¶ 187, citingStrickland v. Washington (1984), 466 U.S. 668. The Supreme Court inStrickland held: "Judicial scrutiny of counsel's performance must be highly deferential. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. There is a strong presumption that the attorney's performance was reasonable. Id. A *Page 22 
debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel. State v. Phillips, 74 Ohio St.3d 72,85, 1995-Ohio-171. In State v. Clayton (1980), 62 Ohio St.2d 45, the Ohio Supreme Court discussed an attorney's choice of trial strategy and held: "* * * the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client." Id. at 49.
 {¶ 89} This court has held that errors of judgment regarding tactical matters do not substantiate a claim of ineffective assistance of counsel. State v. Vinson, 11th Dist. No. 2006-L-238, 2007-Ohio-5199, at ¶ 31.
 {¶ 90} First, appellant argues trial counsel did not sufficiently probe one apparent inconsistency between the trial and preliminary hearing testimony of Richard Sage. At the preliminary hearing, Richard testified that between appellant and his unknown accomplice, Richard did not know who had hit him with a crowbar, while at trial, he testified it was appellant who had struck him. Appellant concedes that his trial counsel cross-examined Richard about this inconsistency, but argues counsel should have asked him more questions about this inconsistency. Mr. Morrison testified at the hearing on the motion for new trial that this was a matter of strategy. He said he pointed out the inconsistency on cross-examination and that after the point was made, there was no need for him to belabor it.
 {¶ 91} Next, appellant argues that at trial Duane testified he shot his gun as he fell to the ground, while at the preliminary hearing, he testified he shot the gun at appellant. Appellant argues that at trial Duane suggested the shooting was accidental so his trial counsel should have cross-examined Duane on this point. However, Duane testified at trial that when he shot the gun, he was aiming at "figures" because, due to *Page 23 
his head injury, that was all he could see. Mr. Morrison testified at the motion hearing that there was no inconsistency because at both hearings, Duane testified he intended to injure his assailant. As a result, Mr. Morrison testified there was no point in cross-examining on this issue.
 {¶ 92} Next, appellant argues that because Duane testified at trial he heard the entrance door get kicked in, while at the preliminary hearing he said he heard knocking at the door, trial counsel should have cross-examined him on this point. However, the undisputed evidence at trial was that at first appellant knocked at the door and then kicked it in. As the trial court pointed out, there was no inconsistency here.
 {¶ 93} It is well settled that counsel's decision to cross-examine a witness and the extent of such cross-examination are matters of trial strategy, which generally do not show ineffective assistance of counsel.State v. Flors (1987), 38 Ohio App.3d 133, 139.
 {¶ 94} Finally, appellant argues his trial counsel should have objected to the comment of the prosecutor in closing argument that the defense could not explain away the DNA evidence regarding appellant's blood being found at the scene. Mr. Morrison testified that his trial strategy was to show that while appellant was at the scene, he did not rob and assault the victims. Thus, he said the state's comment was consistent with his defense and he did not object as a matter of strategy.
 {¶ 95} We note the trial court instructed the jury that closing arguments are not evidence. Thus, it was within counsel's realm of tactical decision-making to choose to avoid interrupting closing arguments to voice an objection. See State v. Keene, 81 Ohio St.3d 646,668, 1998-Ohio-342. The failure to object, even to prosecutorial misconduct, "does not constitute ineffective assistance of counselper se as that failure may be *Page 24 
justified as a tactical decision." (Emphasis added.) State v. Gumm,73 Ohio St.3d 413, 428, 1995-Ohio-24.
 {¶ 96} Even if trial counsel's representation constituted deficient performance, appellant still would have been obligated to demonstrate that counsel's performance prejudiced his defense. As stated above, to show ineffective assistance of counsel, a defendant must show his counsel's deficiencies were so serious, they rendered the result of the trial unreliable or fundamentally unfair. Strickland, supra, at 687. Appellant has failed to make any such showing.
 {¶ 97} Appellant's first assignment of error is not well taken.
 {¶ 98} For his second assignment of error, appellant contends:
 {¶ 99} "ANY SENTENCE GREATER THAN THE MINIMUM TERM (WHICH JONES' SENTENCE IS), VIOLATES THE JURY TRIAL CLAUSE OF THE SIXTH AMENDMENT, AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT."
 {¶ 100} Appellant argues that in sentencing him to more than the minimum sentence pursuant to the Ohio Supreme Court's decision inState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the trial court violated appellant's due process rights and his right to jury trial under the Sixth Amendment to the United States Constitution.
 {¶ 101} The arguments asserted by appellant challenging the right of the trial court to sentence appellant to more than the minimum sentence are essentially the same as those arguments raised and rejected in numerous prior decisions of this court. See State v. Green, 11th Dist. Nos. 2005-A-0069 and 2005-A-0070, 2006-Ohio-6695; State v. Elswick, 11th Dist. No. 2006-L-075, 2006-Ohio-7011, at ¶ 30, discretionary appeal not *Page 25 
allowed at 113 Ohio St.3d 1513, 2007-Ohio-2208; State v. Dudas, 11th Dist. Nos. 2006-L-267 and 2006-L-268, 2007-Ohio-6739, at ¶ 117-125. This court has also rejected appellant's argument that Foster deprived him of his right to trial by jury. State v. Mattes, 11th Dist. No. 2008-P-0022,2008-Ohio-4972, at ¶ 14.
 {¶ 102} These same arguments have also been consistently rejected by other Ohio appellate districts and federal courts. See State v.Gibson, 10th Dist. No. 06AP-509, 2006-Ohio-6899; State v. Moore, 3d Dist. No. 1-06-51, 2006-Ohio-6860, at ¶ 9; United States v.Portillo-Quezada (C.A. 10, 2006), 469 F.3d 1345, 1354-1356, and the cases cited therein.
 {¶ 103} Finally, these arguments have essentially been rejected by the Ohio Supreme Court as a result of the Court's refusal to exercise jurisdiction in Elswick, supra.
 {¶ 104} Appellant's second assignment of error is not well taken.
 {¶ 105} For the reasons stated in the Opinion of this court, the assignments of error are without merit, and it is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.
 DIANE V. GRENDELL, P.J., COLLEEN MARY O'TOOLE, J., concur. *Page 1