THOMAS R. WRIGHT, J.
{¶ 1} Appellant, Jeffrey D. Ryan, shot and killed his father on the day his father was moving out of the family home. Appellant, an adult, lived in the home with his mother at the time.
{¶ 2} Appellant was indicted on aggravated murder, murder, felony murder, and felonious assault charges. Each offense included a gun specification. A jury found him guilty of all charges. The trial court merged the offenses for sentencing. Appellant was sentenced to an indefinite term of thirty years to life consecutive to the mandatory three-year term on the firearm specification. We affirm.
*664 {¶ 3} Appellant asserts three assigned errors on appeal. His first assigned error alleges:
{¶ 4} "The Appellant's conviction for aggravated murder is neither supported by the sufficiency of the evidence nor the manifest weight of the evidence, in violation of the Defendant's right to a fair trial guaranteed by the Sixth Amendment to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution."
{¶ 5} Whether evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson , 162 Ohio St. 486, 124 N.E.2d 148 (1955). "While a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, it may nevertheless conclude that the judgment is against the weight of the evidence. Id. ; State v. Thompkins , 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).
{¶ 6} "Raising the question of whether the evidence is legally sufficient to support the * * * verdict as a matter of law invokes a due process concern. State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In reviewing such a challenge, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560." State v. Diar , 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113.
{¶ 7} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. ' (Emphasis added.) Black's, supra, at 1594.
{¶ 8} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth * * * juror' " and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs [v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.] See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')" State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).
{¶ 9} If the trial court's judgment results from a jury trial, it can only be reversed on manifest weight grounds by a unanimous concurrence of all three judges on the appellate panel reviewing the case. Id. at 389, 678 N.E.2d 541. The fact that the evidence is susceptible to more than one interpretation does not render a conviction against the manifest weight of the evidence. State v. Ramey , 2d Dist. Clark, 2015-Ohio-5389, 55 N.E.3d 542, ¶ 50, appeal not allowed , *665 145 Ohio St.3d 1458, 2016-Ohio-2807, 49 N.E.3d 321. "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." Id. at ¶ 51.
{¶ 10} R.C. 2903.01(A) aggravated murder provides:
{¶ 11} "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."
{¶ 12} Appellant claims his convictions are not supported by sufficient evidence because the victim, Thomas, started the physical altercation and that Thomas attempted to obtain the gun from appellant. Appellant says he only shot him out of fear for his own safety and that he was acting in self-defense and in defense of his mother.
{¶ 13} Further, appellant wholly denies having any intent to kill his father and that he only had the gun for home protection. He argues that the state's case lacked evidence of any prior calculation and design, and as such, his aggravated murder conviction is not supported by sufficient evidence and is contrary to the manifest weight of the evidence. We disagree and find both sufficient evidence of prior calculation and design and that his convictions are not against the manifest weight of the evidence.
{¶ 14} Appellant's parents had recently dissolved their marriage and appellant and his mother, Sandy Ryan, were going to continue to live in the family home. Appellant's father, Thomas Ryan, had recently moved out, but still needed to move the last of his possessions.
{¶ 15} On May 6, 2015, Thomas, along with his brother, Tim Ryan, and two of his friends, Gary Anderson and John Damon, arrived at the Conneaut, Ohio residence to move out the rest of his possessions.
{¶ 16} Appellant and his mother were home and Sandra had a list of the items that Thomas planned to take. Sandra followed Thomas around the home to confirm that he only took his designated belongings. Appellant, who had a strained relationship with his father, remained seated in a chair in the living room while Thomas, Tim, Gary, and John loaded the trucks.
{¶ 17} Sandra and Thomas eventually began arguing about possession of a boat constructed from matchsticks that was hanging above the chair where appellant was sitting. Thomas made the boat when he was in the Air Force. It is encased in glass and has Sandra's name on the side.
{¶ 18} According to Gary, they took about 45 minutes to load Thomas' things. The boat was the last item to get. They were outside when Gary followed Thomas into the house to get the boat. Thomas reached up toward the boat and appellant stood up with a gun in his right hand. Gary explained:
{¶ 19} "[Thomas] leaned over * * * a little ways and reached up for the boat * * * to get the boat.
{¶ 20} "* * *
{¶ 21} "Jeffrey got up with a gun.
{¶ 22} "Q. Where was the gun?
{¶ 23} "A. It was on * * * his side, and the gun came up, the gun came up and he stood up from his side. Of his leg. His right leg.
{¶ 24} "* * *
{¶ 25} "Q. And then what happened?
{¶ 26} "A. Tommy dropped his arms and gave - turned to his son and gave him a push.
{¶ 27} "Q. Okay. Did Jeff go anywhere when he pushed him?
*666 {¶ 28} "A. Yes.
{¶ 29} "* * *
{¶ 30} "A. Came - came back towards me. I mean, fell back towards me, just a couple steps back towards me, backwards.
{¶ 31} "Q. Okay. Did he hit the floor?
{¶ 32} "A. No.
{¶ 33} "Q. What happened after Tom pushed him?
{¶ 34} "A. Jeffrey went back after him.
{¶ 35} "* * *
{¶ 36} "A. Went - - went towards his dad.
{¶ 37} "* * *
{¶ 38} "A. They had ahold of each other.
{¶ 39} "Q. Okay. You've kind of shown us something, but this lady is taking down your words, so I need you to describe it for me. Where were Jeff's hands?
{¶ 40} "A. * * * Jeff's hands were - one hand was on his - his dad's chest area or shoulder area.
{¶ 41} "* * *
{¶ 42} "A. And the gun was up in this area, and they turned * * * and then Tommy had ahold of his * * * son with his other arm, and then the gun come up and Tom - Tommy seen the gun and he looked - Tommy looked like he tried to turn it."
{¶ 43} Gary further stated that after Thomas first pushed his son, appellant was three to five feet away from his father before appellant raised the gun to about navel height before going "back after" his father.
{¶ 44} The two were then holding onto one another's shirts with one hand and their other hands were fighting over possession of the gun. Gary said appellant overpowered his father, and then appellant "stepped in pretty close to [Thomas], and the gun went off into his chest." Thomas then grabbed his chest and fell to the ground. Gary quickly got out of the house. He was afraid since appellant still had the gun in his hand. Gary recalls appellant having the gun in his hand during the entire altercation with his father.
{¶ 45} Appellant described his relationship with his father "at best nonexistent" and at worst abusive. Appellant described his father as quick to get angry and stated that he used his belt to hit appellant numerous times while growing up. Appellant said that he could tell when his father was very angry stating, "his face would get really dark red. His vein on his forehead would - - would pop out, and * * * his eyes would go really wild like, like a wild dog's." He recalls his father leaving marks and bruises on him many times. Appellant says he never told anyone about his father's abuse because he was afraid of further beatings and because he did not want to be taken away from his mom.
{¶ 46} Appellant describes his father as "coming after" him about three months before his parents filed their dissolution, but that Thomas did not harm him, and only scared him. He thought his father was going to kill him then. He testified that the boat made from matchsticks belonged to his mother and that his dad made it for her while he was in the Air Force.
{¶ 47} On the day of his father's death, appellant recalls sitting in his chair in the living room. His mother and father were arguing and yelling about the boat. Appellant was playing a game on his phone when he saw his father was red in the face, yelling, and his hands were waiving in the air in his mother's face. Appellant says he was afraid for his mother.
{¶ 48} Appellant says he was about to get out of his chair to get out of the way *667 for his father to get the boat. He had two guns next to his chair for protection reasons due to recent break-ins and high drug use in the area. Appellant put the guns there, two days before the shooting.
{¶ 49} Appellant stood up. His father was in front of him within one foot away. His father looked very angry, was red in the face, and had the vein popping out on his forehead like he did when he beat appellant as a child. Appellant said he was afraid for his life, but that he put his hand on his father's chest and said "You need to leave." His father then swung at appellant with his right hand, but missed. Appellant denies having the gun in his hand at this point, but says he picked up the gun after his father swung at him.
{¶ 50} Thomas was holding appellant by the sweater with his left hand. Appellant had the gun in his right hand and was trying to push Thomas away with his left hand. He testified:
{¶ 51} "I originally grabbed the gun just to try to get him away from me, but at this point I - - I was trying to, you know, I was bent over, * * * looking at the floor, and I was trying to move myself away (indicating) from him toward - - toward the door.
{¶ 52} "* * *
{¶ 53} "* * * He grabbed at my hand that had the gun. At that point he had let go of my - my shirt * * * grabbing onto my wrist with the - - the hand that had the gun in it.
{¶ 54} "* * * [H]e started to pry * * * my fingers away from the gun, and I felt like if he had gotten his hands on the gun, he would have killed me. And probably killed my mother. And so, you know, at that point I took the safety off the gun, I flicked my wrist up, and I pulled the trigger."
{¶ 55} Appellant said he shot his father in order to protect himself since he believed that his father would kill him.
{¶ 56} After being handcuffed at the scene and while being escorted to the police cruiser, appellant stated, "Yeah, I shot him."
{¶ 57} Appellant says his police interview did not include all the details he remembered since he was still in shock at the time. He said he did not want to shoot his father that day. He recalls his father in January of 2015, after his parents filed their dissolution, grabbing his mom by the shirt and shoving her against the wall. According to appellant, his dad had the same characteristics the day of his death as he had in the past when he would become violent.
{¶ 58} Once when appellant was in seventh grade, he came home with his report card and his father beat him numerous times with his belt and even hit him with the buckle. His dad hit his mother this same day when she tried to stop the violence.
{¶ 59} Appellant was six feet and one inch tall and his father was five feet and five inches tall and 155 pounds. Appellant testified that he suffers from fibromyalgia, sleep apnea, chronic fatigue syndrome, spinal stenosis, and several bulging discs in his back. Appellant says his father lifted weights for 30 years and would have been able to kill him without a weapon since he was "trained by the government to be a weapon."
{¶ 60} Sandra said Thomas had a list of the things he was supposed to be taking that day, and appellant and his mother had moved everything out of the living room so Thomas would not have to enter that room.
{¶ 61} After the shooting, the gun was found in the dining room on an old record *668 player. The gun had its hammer cocked and was ready to fire.
{¶ 62} Detective Sergeant Michael Colby testified that he interviewed appellant after the shooting, during which appellant confirmed that he knew his father was coming the day of the shooting. Appellant said he was relieved that his father was moving out and that his dad had been moving items out of the home that his mom did not agree with. Appellant told Colby that he had five guns in the house. He started keeping the Beretta in the living room two days before the shooting. Appellant said he put the loaded clip in the gun the day before the shooting, and he placed it on the table in the living room with the external safety on the day of the shooting.
{¶ 63} He told police that he got up from his chair that day to stop his dad from taking the ship, which was his mother's.
{¶ 64} Upon being asked if he had thought of shooting his dad that day appellant answered no. But upon being asked if he had prior thoughts of shooting his dad, appellant answered yes, but that he had not had any serious thoughts about that since high school. Appellant says he joked with people about it because he had a morbid sense of humor, but explained there was no longer a need to shoot his father since he was leaving.
{¶ 65} In his interview with the police, appellant was asked whether he anticipated a problem the day his father moved out, and he said, "I can't say it didn't go through my mind." He also told police that his father's yelling at his mom that day made him angry. Appellant told police that he knowingly pulled the trigger and shot him "[t]o keep him from hurting me."
{¶ 66} During cross-examination, the state pointed out that appellant did not tell the police that his father swung at him. Instead, appellant added this detail at trial and explained that he did not remember this fact immediately after the shooting and that the police failed to ask him if his father swung at him.
{¶ 67} Although appellant said he was afraid for his life on the day of the shooting, he testified that the last time his dad hit him he was 23 years old. He was 38 at the time of trial. Nevertheless, appellant explained that his father's abuse continued in a mental and emotional way.
{¶ 68} Sandra met with Robert Stroud, Jr., a financial advisor, two weeks before Thomas' death. Stroud was Thomas' friend and financial advisor to both Thomas and Sandra. Sandra and appellant were in Stroud's office to discuss plans for Sandra's assets after the dissolution. Stroud described hearing a lot of "Tom-bashing" from appellant during the meeting that Stroud tried to ignore. At one point, however, he heard appellant say something like he would "shoot him" referring to Thomas, and in response, Sandra slapped appellant on the arm. At about this same time appellant said, "God hates me and the devil's afraid of me." Stroud described appellant's demeanor at the time as unemotional. Upon learning about Thomas' death, Stroud called the police to convey what he heard.
{¶ 69} Appellant's cousin Grant Bennett, Jr. confirmed that appellant had him at the house the first week of May to change the locks because Thomas was moving out. Appellant asked Grant to show him and his mother how to take care of their guns, clean them, and shoot them. Grant was shown two guns that day, a Beretta semiautomatic and a Blackhawk .22. The guns were both in cases at the time. Sandra inherited the guns from her father. Grant took the clip out of the Beretta and turned the safety on. Grant then told appellant *669 that he would have to figure out this particular gun and help him clean it another day. Grant explained to appellant how the safety works and he put the clip back in the gun without bullets in it.
{¶ 70} Appellant told Grant that he wanted to know how to use the guns because of increased crime in the area.
{¶ 71} In an effort to depict Thomas as only provoking appellant at the time the altercation began, defense counsel argued that it would have been physically impossible for Thomas to reach the ship saying that it was too high up and that he would have needed a ladder or step stool. However, appellant described getting up from his chair in order to stop his father from taking the ship.
{¶ 72} Sandra testified that she and Thomas filed their dissolution in April of 2015. She said that Thomas had pushed her against the wall on one occasion in January or February that same year. She was an elementary school teacher for 35 years. She never reported Thomas' abusive behavior because she was afraid. Sandra said her nephew was changing the locks on her home because she was fearful that Thomas would come back.
{¶ 73} Thomas had prepared a list that Sandra saw well in advance. Thomas had included the boat on the list, but she had written "no" next to it because he had given her the boat as a gift.
{¶ 74} On the day of the shooting, Sandra recalls appellant was in his recliner, but she does not recall the gun sitting on the table before the altercation. She was in the kitchen when Thomas told her he was taking the ship. He was yelling at Sandra when he walked toward appellant. She recalls him then walking back toward her and appellant standing up and picking up the gun. She said she was in fear for her life at that point.
{¶ 75} Sandra recalls Thomas walking over and hitting appellant, and appellant told him to get out and leave his mother alone. Thomas pushed appellant and the two then fought for the gun. She recalls, "they were fighting, and both of them were bent over. The gun was almost at the floor. * * * And Tom was still grappling with him for the gun, and the gun went off."
{¶ 76} During her interview with police, Sandra did not tell the police that she felt like she was in danger. She told police that Thomas did not come within three feet of her that day.
{¶ 77} Appellant's older brother Ryan testified that their father used to discipline appellant with his hand and his belt on his backside or bottom but only rarely and "only when we deserved it." Ryan moved out of the home in 1993 and he denied that their father ever bruised appellant. Ryan recalls tension in the house because he said appellant chose not to have a relationship with their dad.
{¶ 78} No bright-line test exists as to whether prior calculation and design is present in a case. State v. Coley, 93 Ohio St.3d 253, 263, 754 N.E.2d 1129 (2001) citing State v. Taylor, 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 89 (1997). However, the Supreme Court has explained that " ' "prior calculation and design" is a more stringent element than the "deliberate and premeditated malice" * * * required under prior law.' State v. Cotton (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus. 'Instantaneous deliberation is not sufficient * * *.' Id. , paragraph two of the syllabus.
{¶ 79} " ' "[P]rior calculation and design" requires "a scheme designed to implement the calculated decision to kill." ' State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 918, quoting *670 State v. Cotton, 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d at 193." Coley, supra.
{¶ 80} Here, the evidence is sufficient to establish prior calculation and design.
{¶ 81} Two weeks before the shooting, appellant stated that he would shoot his father in front of his mother's financial advisor. Two days before the incident, appellant asked his cousin Grant to show him how to use and clean the handguns. Further, Sandra had advance notice that Thomas wanted to take the ship made from matchsticks, and appellant knew his father was coming that day to take the last of his possessions. The day before his father was moving out, appellant loaded the handgun and placed it next to his chair that sat under the ship.
{¶ 82} On the day of the shooting, appellant remained seated in his chair under the ship for almost the entirety of the 45 minutes it took his father and friends to load his belongings. Upon his father's approach toward the chair and the ship, appellant stood up and told his father to leave. His father pushed him and appellant stepped back. The two were at least three feet apart. Appellant then charged back at his father and the struggle ensued during which appellant had the loaded gun in his hand. The two continued to struggle, and appellant deliberately turned the safety off, pointed the gun toward his father, and shot him at close range in the chest.
{¶ 83} We likewise find appellant's conviction supported by the manifest weight of the evidence. While the facts and arguments presented by the defense, if believed, undermined to some degree prior calculation and design, the jury was in the best position to judge the credibility of the witnesses, observe their demeanor, voice inflections, and gestures, and use these observations to weigh the credibility of all the evidence. Dover v. R.J. Corman RR. Co. Cleveland Line , 181 Ohio App.3d 31, 2009-Ohio-562, 907 N.E.2d 1198, ¶ 27 (5th Dist.)
{¶ 84} Appellant's first assigned error lacks merit.
{¶ 85} Appellant's second assigned error alleges:
{¶ 86} "The trial court erred to the prejudice of the Appellant by excluding evidence related to the physical abuse of Mrs. Ryan and the victim's history of violence, in violation of the Defendant's right to a fair trial guaranteed by the Sixth Amendment to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution."
{¶ 87} Appellant claims he and Sandra should have been permitted to testify about his father's long history of abusing him and his mother. He asserts that the evidence was improperly excluded and that had this evidence not been excluded, the jury would have found he was acting in self-defense or in defense of Sandra at the time.
{¶ 88} Trial courts have broad discretion in admitting evidence, and an appellate court should not disturb a trial court's decision unless there was an abuse of its discretion and the defendant was materially prejudiced. State v. Issa , 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).
{¶ 89} " '* * * [T]he term "abuse of discretion" is one of art, connoting judgment exercised by a court, which does not comport with reason or the record.' State v. Underwood, 11th Dist. No. 2008-L-113, 2009-Ohio-2089, 2009 WL 1177050, ¶ 30, citing State v. Ferranto, 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925). * * * [A]n abuse of discretion is the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'
*671 State v. Beechler, 2d Dist., 2010-Ohio-1900, 2010 WL 1731784, ¶ 62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11. When an appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error (of course, not all errors are reversible. Some are harmless; others are not preserved for appellate review). By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.' Id. at ¶ 67." Ivancic v. Enos , 2012-Ohio-3639, 978 N.E.2d 927, ¶ 70 (11th Dist.).
{¶ 90} "To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. State v. Robbins (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus." State v. Barnes , 94 Ohio St.3d 21, 24, 2002-Ohio-68, 759 N.E.2d 1240.
{¶ 91} Appellant claims that additional testimony detailing Thomas' prior acts of violence should have been admitted to show that appellant had a bona fide belief that he was in imminent danger of death or great bodily harm at the time of the shooting.
{¶ 92} In State v. Vinson , 11th Dist. Lake No. 2006-L-238, 2007-Ohio-5199, 2007 WL 2821963, ¶ 63-64, we considered this issue in a comparable case and held,
{¶ 93} "There is no question that '[a] defendant, when arguing self-defense, may testify about specific instances of the victim's prior conduct known by the defendant, in order to establish the defendant's state of mind.' State v. Marsh (Oct. 20, 1995), 11th Dist. No. 93-T-4855, 1995 Ohio App. LEXIS 4625, 10, citing McGaw v. State (1931), 123 Ohio St. 196, 174 N.E. 741. 'These events are admissible in evidence, not because they establish something about the victim's character, but because they tend to show why the defendant believed the victim would kill or severely injure him.' Id. citing State v. Carlson (1986), 31 Ohio App.3d 72, 73, 508 N.E.2d 999, citing State v. Randle (1980), 69 Ohio App.2d 71, 73, 430 N.E.2d 951. Thus, evidence of the victim's character offered to show the defendant's state of mind falls outside the boundaries of character evidence, Evid.R. 404 and 405, and instead is governed by the general evidentiary rules of admissibility, Evid.R. 401 and 403."
{¶ 94} Before a trial court can admit these types of statements offered to show the defendant's state of mind, the court must balance the probative versus prejudicial effects the evidence will have on the jury via Evid.R. 403. Id.
{¶ 95} " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.
{¶ 96} Evid.R. 403 provides:
{¶ 97} "(A) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
{¶ 98} "(B) Exclusion Discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, *672 or needless presentation of cumulative evidence ." (Emphasis added.)
{¶ 99} In State v. Cooperider , 2003-Ohio-5133, 2003 WL 22229420, ¶ 11 (3rd.Dist. Marion No. 9-03-11), the Third District Court of Appeals agreed with our holding in Vinson and concluded:
{¶ 100} "[A] defendant arguing self-defense may testify about specific instances of prior violent conduct by the victim to establish the defendant's state of mind at the time of the incident. State v. Carlson (1986), 31 Ohio App.3d 72, 508 N.E.2d 999 (emphasis added). Use of character evidence in this manner is not objectionable as it is offered for the purpose of proving the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from the danger was the use of force. State v. Brown, Marion App. No. 9-02-02, 2002-Ohio-6765, 2002 WL 31758593 (citation omitted)."
{¶ 101} However, the Cooperider court limited the relevant evidence as including only those instances of conduct relevant to proving the defendant was in imminent danger at the time of the offense . It stated, "[e]vidence of other acts must be temporally and circumstantially connected to the facts of the offense alleged. State v. Burson (1974), 38 Ohio St.2d 157, 311 N.E.2d 526." Id. at ¶ 16. It found that the victim's past violent acts occurring four years before the incident in issue there were too distant in time and unrelated, and as such, they were properly excluded. Id.
{¶ 102} Unlike the court in Cooperider and contrary to appellant's argument, the trial court permitted testimony from appellant and his mother about Thomas' past acts of violence against both. The trial court, however, limited the testimony regarding Thomas' specific prior acts to the most recent two against appellant. One involved a beating that appellant endured at the hands of his father fifteen years before the shooting. The other admitted prior act involved Thomas "coming after" appellant causing appellant to fear for his life, but during which Thomas did not physically harm appellant.
{¶ 103} The trial court also allowed Sandra to testify about Thomas' most recent act of violence toward her that occurred in January or February of 2015, only a few months prior to the shooting during which he pinned her against a wall and grabbed her by the shirt. Appellant and Sandra confirmed that these incidents were the last time that appellant had laid hands on them in a violent manner.
{¶ 104} Moreover, both appellant and Sandra testified about Thomas' general violent nature and confirmed that he beat appellant and was violent toward Sandra for the duration of appellant's childhood. The defense likewise emphasizes this fact in its closing argument upon urging the jury to find that appellant was acting in self-defense or in defense of his mother at the time he shot his father.
{¶ 105} In support of this argument, appellant's counsel proffered the following at trial: "Sandra Ryan, was not allowed to go into all the instances where her husband had committed domestic violence against her. We were limited to two by the court and one close to the incident * * *. The other one, we didn't have an exact date * * * but we were precluded from going into any other incidents."
{¶ 106} This proffer, however, lacks specificity and fails to detail the dates of the alleged prior violent acts, the number of prior violent acts excluded, and does not establish whether appellant was present during the victim's alleged prior acts of violence that were excluded. Absent a more detailed proffer, we are unable to determine whether these additional prior *673 acts of violence by Thomas were relevant in assessing appellant's state of mind and whether they were sufficient to support a finding that he had a bona fide belief that he was in imminent danger of death or serious bodily harm at the time of the shooting. We are also unable to assess whether the excluded testimony's probative value would have been substantially outweighed by its prejudicial effect if these prior violent acts by Thomas constituted the "needless presentation of cumulative evidence." Evid.R. 403(B). Accordingly, we find no abuse of discretion, and appellant's second assigned error lacks merit.
{¶ 107} His third assignment of error asserts:
{¶ 108} "The trial court erred to the prejudice of the Appellant by failing to give the jury a voluntary manslaughter instruction when the instruction was properly supported by the Record, in violation of the Defendant's right to a fair trial guaranteed by the Sixth Amendment to the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution."
{¶ 109} As we discuss below and consistent with appellant's argument, the evidence presented at trial warrants a voluntary manslaughter instruction. However, it is plausible that appellant's counsel chose not to seek a voluntary manslaughter instruction as part of a reasonable tactical decision. He also did not object to the trial court's failure to instruct on this inferior offense. Thus, appellant waives all but plain error. And because appellant fails to show that the outcome of the trial would have been different absent this inferior offense instruction, this assigned error lacks merit. State v. Kiehl , 11th Dist. Portage, 2016-Ohio-8543, 78 N.E.3d 1226, ¶ 27-28, citing State v. Barnes , 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).
{¶ 110} Appellant claims the trial court committed reversible error in failing to provide a jury instruction on voluntary manslaughter. He asserts that his suffering physical abuse at the hands of his father, his witnessing his father abuse his mother, and the fact that a physical altercation preceded the shooting all show sufficient evidence of serious provocation warranting a voluntary manslaughter charge. He claims that because his father initiated the physical contact that day, a jury instruction on voluntary manslaughter was warranted.
{¶ 111} "Voluntary manslaughter is an inferior degree of murder, for ' "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements * * *." ' * * * Even though voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought. * * *
{¶ 112} "Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. * * *
{¶ 113} "When the evidence presented at trial going to a lesser included offense (or inferior-degree offense) meets this test, the trial judge must instruct the jury on the lesser (or inferior-degree) offense. State v. Loudermill (1965), 2 Ohio St.2d 79, 31 O.O.2d 60, 206 N.E.2d 198, syllabus. On the other hand, when the evidence presented at trial does not meet this test, a charge on the lesser included (or inferior-degree) offense is not required.
*674 State v. Kidder (1987), 32 Ohio St.3d 279, 282-283, 513 N.E.2d 311, 315-316." (Emphasis added.) (Citations omitted.) State v. Shane , 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).
{¶ 114} "In making this determination, the trial court must view the evidence in the light most favorable to the defendant." State v. Monroe , 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37, citing State v. Campbell , 69 Ohio St.3d 38, 47-48, 630 N.E.2d 339 (1994).
{¶ 115} R.C. 2903.01(A) aggravated murder provides:
{¶ 116} "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."
{¶ 117} Whereas, voluntary manslaughter, as set forth in R.C. 2903.03(A), prohibits:
{¶ 118} "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force , shall knowingly cause the death of another or the unlawful termination of another's pregnancy." (Emphasis added.)
{¶ 119} "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." State v. Deem , 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph five of the syllabus (1988),holding modified by State v. Smith, 117 Ohio St.3d 447, 2008-Ohio-1260, 884 N.E.2d 595.
{¶ 120} Here, an instruction on the inferior offense of voluntary manslaughter was supported by the evidence. Thomas entered the room in which appellant was seated and initiated the physical altercation. Appellant either had a gun in his hand prior to the altercation or picked it up during the fight. The two fought over possession of the gun, and appellant feared that Thomas was going to kill him if he gained control of the gun. A rational jury could have reasonably inferred that appellant shot his father under a sudden fit of passion or rage brought on by his father's initiation of the physical altercation.
{¶ 121} Notwithstanding this conclusion, we do not find plain error because appellant has not shown that the outcome would have been different absent the error.
{¶ 122} Crim.R. 30(A) states "a party may not assign as error [on appeal] the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict * * *." However, appellate courts may notice "[p]lain errors or defects affecting substantial rights * * * although they were not brought to the attention of the [trial] court." Crim. R. 52(B).
{¶ 123} Appellant did not oppose the state's motion to exclude a voluntary manslaughter instruction and did not object to the trial court's jury instructions or the verdict forms provided at trial. He likewise did not request a jury instruction on voluntary manslaughter. Instead, appellant argued that he was acting in self-defense upon shooting his father or in defense of his mother. His attorney argued to the jury that it should find appellant not guilty because he was acting in self-defense. Accordingly, appellant waived all but plain error.
*675 {¶ 124} Appellate courts should notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is an obvious deviation from a legal rule that affects the outcome of the trial. State v. Kiehl , 11th Dist. Portage, 2016-Ohio-8543, 78 N.E.3d 1226, ¶ 27-28, citing State v. Barnes , 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The appellant must show that the outcome would have been different absent the plain error. Id.
{¶ 125} Moreover, appellant's theory of the case was that he only shot his father in self-defense and in defense of his mother. It is reasonable to conclude that his counsel chose this all or nothing defense in an effort to avoid conviction, and counsel chose not to present the inconsistent argument that appellant acted in a sudden fit of rage. The jury nevertheless found appellant guilty of aggravated murder. " '[W]here the failure to request a jury instruction is the result of a deliberate, tactical decision on part of trial counsel, it is not plain error." Kiehl at ¶ 30, quoting State v. Hubbard , 10th Dist. Franklin No. 11AP- 945, 2013-Ohio-2735, 2013 WL 3341171, ¶ 35.
{¶ 126} Ordinarily, it is the quality of the evidence offered that is determinative, not the defendant's trial strategy, as to whether a trial court must give a lesser-included offense instruction. State v. Wine , 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, ¶ 26. However, once a defendant makes a tactical decision in not seeking a lesser-included offense instruction, he cannot "successfully claim plain error on appeal" based on the trial court's decision not to include the instruction. Id. at ¶ 29-30, citing State v. Clayton , 62 Ohio St.2d 45, 47-48, 402 N.E.2d 1189 (1980) (finding no manifest injustice and no plain error since counsel did not seek a jury instruction on the lesser-included offense.) Accordingly, this is not the exceptional case where reversal is warranted to prevent a manifest miscarriage of justice.
{¶ 127} Appellant's third assigned error lacks merit and is overruled.
{¶ 128} The trial court's decision is affirmed in full.
CYNTHIA WESTCOTT RICE, J., concurs,
COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.
COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.
{¶ 129} I concur with the majority's well-reasoned disposition of appellant's first and second assignments of error. However, I must dissent regarding the third assignment of error: the trial court should have instructed on the inferior offense of voluntary manslaughter. Consequently, I would reverse and remand for new trial.
{¶ 130} As the majority acknowledges, the evidence in this case supports giving an instruction on voluntary manslaughter. However, the majority concludes this was a reasonable strategic or tactical decision by counsel - that counsel wished to go for the "all or nothing" defense of self-defense. I have reviewed the entire file and transcript in this case. Again, as the majority acknowledges, the state moved in limine to exclude any instruction on voluntary manslaughter, and appellant failed to oppose the motion. And appellant's counsel did not request the instruction.
{¶ 131} There is a presumption that when counsel fails to request an instruction *676 justified by the evidence, that this is a strategic or tactical decision. State v. Willis , 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, 2014 WL 197876, ¶ 57, quoting State v. Riley , 10th Dist. Franklin No. 06AP-P1091, 2007-Ohio-4409, 2007 WL 2421816, ¶ 5, citing State v. Griffie , 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). From the record, I cannot agree that is true in this case. There is absolutely no discussion of the issue in the transcript. The trial court never inquired of counsel whether he desired that the jury be instructed on voluntary manslaughter. The issue was one of profound importance in this case: I would expect counsel and the trial court to put it on the record.
{¶ 132} A trial court always has the discretion to give an instruction on a lesser included offense or an offense of an inferior degree if the evidence warrants it. In Wine , supra , that was the law pronounced by the Supreme Court of Ohio - that a defendant could not prevent a trial court from giving such an instruction. Id. at ¶ 34. Indeed, the court held: "The trial court must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." (Emphasis added.) Id. Trial courts have an independent duty to insure that defendants receive a fair trial. In this case, that means the trial court had a duty to give an instruction on voluntary manslaughter, since the evidence warranted it, or to put on the record that trial counsel did not want the instruction, and his reasons for that decision.
{¶ 133} Again, on this basis I would reverse and remand for new trial.